# WILLOW SPRINGS CONDOMINIUM ASSOCIATION, INC. *v.* SEVENTH BRT DEVELOPMENT CORPORATION ET AL.
## (SC 15755)

Callahan, C. J., and Borden, Norcott, Katz and Palmer, Js.

Argued January 22—officially released June 2, 1998

*Michael D. O'Connell*, with whom was *Julia B. Morris*, for the appellants (named defendant et al.).

*Robert J. O'Brien*, with whom, on the brief, was *Chester J. Bukowski, Jr.*, for the appellee (plaintiff).

*Opinion*

KATZ, J. This appeal encompasses a number of issues related to alleged design, construction and maintenance defects in a condominium complex known as Willow Springs Condominiums (Willow Springs) and in an on-site sewage treatment plant constructed to serve only that condominium complex. The plaintiff, Willow Springs Condominium Association, Inc. (association), has claimed breach of statutory warranties pursuant to the Connecticut Common Interest Ownership Act

(CIOA)[1] and the New Home Warranties Act (NHWA),[2] as well as violation of the Connecticut Unfair Trade Practices Act (CUTPA),[3] breach of fiduciary obligations by individuals who were employees and officers of several of the defendants and who served on the executive board of the association, in addition to various common-law tort claims. The named defendant, Seventh BRT Development Corporation (Seventh BRT), appeals from the judgment of the trial court, after a jury trial, in favor of the association, which represents the individual owners of condominium units. Seventh BRT, which was the developer of Willow Springs, is one of several original defendants to this action.[4]

---

[1] General Statutes § 47-200 et seq. The CIOA governs the rights and obligations of parties regarding the financing, construction, organization, sale, and management of common interest communities created on or after January 1, 1984. Common interest communities include condominiums, cooperatives and planned communities.

[2] General Statutes § 47-116 et seq. The NHWA governs warranties relating to the sale of an improvement, which is defined as "any newly constructed single family dwelling unit, any conversion condominium unit being conveyed by the declarant and any fixture or structure which is made a part thereof at the time of construction or conversion . . . ." General Statutes § 47-116.

[3] General Statutes § 42-110a et seq. CUTPA provides a cause of action against anyone who engages in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b (a).

[4] The original defendants were: Seventh BRT, which was the developer and declarant of Willow Springs; Danbury Crossroads Corporation, formerly known as BRT Development Corporation, which owned the property before it was designated as a condominium development and before construction began on the complex; Little Rock Properties Corporation, formerly known as BRT Corporation, which was the general contractor for the Willow Springs project; Condominium Management Group, a division of Little Rock Properties Corporation, which served as the property manager between July 12, 1985, and December 31, 1990; Martin Lillis, who, as MTL Enterprises, operated the sewage treatment plant; and Dennis McDonald, Edmund J. Nahom and Teresa LaCroce, who were employees and officers of Seventh BRT and had served on the association's board. Although liability was found against Little Rock Properties Corporation, Danbury Crossroads Corporation and Condominium Management Group under the unity of interest doctrine; see parts II F and G of this opinion; for purposes of this opinion, we treat Seventh BRT as the sole appellant.

## I

In the interests of clarity, before describing the various defects in the complex alleged in the complaint, we first address the history of the development of the Willow Springs project and the relationships among the various corporate and individual defendants who were parties to the original action. Second BRT Development Corporation obtained an $18.6 million construction loan to finance the Willow Springs project, which was originally named Kenwood Condominium. In September, 1985, prior to the start of construction, Second BRT Development Corporation merged with Seventh BRT, leaving Seventh BRT as the surviving corporate entity. Construction proceeded in phases over the course of three years, from 1984 until 1987. At the time of trial, the complex was comprised of twenty residential buildings, a sewage treatment plant and a clubhouse. The last units were completed in 1987 and certificates of occupancy for the various units were granted in 1985, 1986 and 1987. The first unit was sold on November 19, 1985. The association assumed control over Willow Springs in August, 1987, shortly after the last building was completed.

On June 11, 1987, after individuals already had purchased a number of units, Seventh BRT sold ninety-two of the remaining units to a partnership called BRT Property Group, for $4,784,000.[5] BRT Property Group held these units for rental until 1991, at which time it began to sell them to individual purchasers. Although individual purchasers of units had signed affidavits that they would occupy the units they purchased, BRT Property Group did not do so. The plaintiff introduced a number of warranty deeds showing that Seventh BRT continued to sell units to individual purchasers from November 19, 1990, through February 20, 1992.

---

[5] These units consisted of phase fifteen of the Willow Springs construction project, which included buildings 7, 9, 12, 18 and 19.

Although the corporate defendants[6] maintained separate legal identities, they had a number of officers and directors in common. Barry J. Bertram was the president of Little Rock Properties Corporation (Little Rock), Danbury Crossroads Corporation (Danbury) and Seventh BRT. The shareholders of Seventh BRT were Bertram, Edmund J. Nahom, and the law firm of Paul S. McNamara as trustee for some of Bertram's children. Dennis McDonald, who served as a director of the association, was an individual partner in BRT Property Group, an officer of Seventh BRT, an officer of BRT Development Corporation (BRT Development), and an officer of BRT Corporation, which owned Condominium Management Group. In addition, McDonald operated Condominium Management Group. BRT Corporation, Nahom and McDonald were partners in BRT Property Group. Nahom, who was senior vice president of BRT Property Group, also served on the association board from August, 1987, until August, 1988, and then again from June, 1991, until early 1993. Teresa LaCroce was a director of Little Rock, Danbury, and Seventh BRT. She was also an employee of BRT Property Group and was actively involved in selling units at Willow Springs. LaCroce testified that she became corporate secretary for Little Rock, Danbury and Seventh BRT in 1989. In describing her positions at these companies, she referred to them as "the sales department" and "the property management department." LaCroce served on the association's board of director's from 1987 until February, 1993. LaCroce testified that Bertram, who is her father, made many of the significant decisions regarding the three companies. Thomas Miller, who is not a defendant in this case, was the treasurer of BRT Property Group, Little Rock, Danbury and Seventh BRT.

---

[6] See footnote 4 of this opinion.

All of the BRT companies were housed in the same office building. The BRT companies voted as a block at general meetings of the association. BRT Development Corporation (now Danbury), BRT Corporation (now Little Rock) and Seventh BRT maintained separate checking accounts and separate corporate books, and also filed separate corporate reports with the secretary of the state. The only company that had employees was Little Rock.

We turn next to the facts surrounding the various design, construction and maintenance defects described in the complaint. Over the course of time, a number of serious difficulties surfaced at Willow Springs, including problems with the sewage treatment plant, the paving and the residential buildings. The plaintiff filed this action on May 13, 1993, claiming, inter alia, breach of warranty with respect to the sewage treatment plant, CUTPA violations, and breach of fiduciary duty. The complaint was amended a number of times adding, inter alia, claims related to other defects. The fourth and final amended complaint was filed on December 7, 1995. That seventeen count complaint alleged that Seventh BRT had breached the implied warranties in the CIOA[7] and the

---

[7] General Statutes § 47-274 provides: "Express warranties of quality. (a) Express warranties made by any seller to a purchaser of a unit, if relied on by the purchaser, are created as follows:

"(1) Any affirmation of fact or promise which relates to the unit, its use, or rights appurtenant thereto, area improvements to the common interest community that would directly benefit the unit, or the right to use or have the benefit of facilities not located in the common interest community, creates an express warranty that the unit, area improvements and related rights and uses will conform to the affirmation or promise;

"(2) Any model or description of the physical characteristics of the common interest community, including plans and specifications of or for improvements, creates an express warranty that the common interest community will substantially conform to the model or description;

"(3) Any description of the quantity or extent of the real property comprising the common interest community, including surveys, creates an express warranty that the common interest community will conform to the description, subject to customary tolerances; and

NHWA[8] with respect to the paving and structural defects in the residential buildings, including, but not limited to,

"(4) A provision that a purchaser may put a unit only to a specified use is an express warranty that the specified use is lawful.

"(b) Neither formal words, such as 'warranty' or 'guarantee', nor a specific intention to make a warranty, are necessary to create an express warranty of quality, but a statement purporting to be merely an opinion or commendation of the real property or its value does not create a warranty.

"(c) Any conveyance of a unit transfers to the purchaser all express warranties of quality made by previous sellers only to the extent such a conveyance would transfer warranties pursuant to chapter 827."

General Statutes § 47-275 provides: "Implied warranties of quality. (a) A declarant warrants to a purchaser that a unit will be in at least as good condition at the earlier of the time of the conveyance or delivery of possession as it was at the time of contracting, reasonable wear and tear excepted.

"(b) A declarant impliedly warrants to a purchaser that a unit and the common elements in the common interest community are suitable for the ordinary uses of real property of its type and that any improvements made or contracted for by him, or made by any person before the creation of the common interest community, will be: (1) Free from defective materials; and (2) constructed in accordance with applicable law, according to sound engineering and construction standards, and in a workman-like manner.

"(c) In addition, a declarant warrants to a purchaser of a unit that may be used for residential use that an existing use, continuation of which is contemplated by the parties, does not violate applicable law at the earlier of the time of conveyance or delivery of possession.

"(d) Warranties imposed by this section may be excluded or modified as specified in section 47-276.

"(e) For purposes of this section, improvements made or contracted for by an affiliate of a declarant are made or contracted for by the declarant.

"(f) Any conveyance of a unit transfers to the purchaser all of the declarant's implied warranties of quality only to the extent such a conveyance would transfer warranties pursuant to chapter 827.

"(g) The warranties provided to a purchaser by a declarant pursuant to this section with respect to common elements shall also extend to the association."

[8] General Statutes § 47-117 provides: "Express warranties. (a) Express warranties by a vendor are created as follows: (1) Any written affirmation of fact or promise which relates to the improvement and is made a part of the basis of the bargain between the vendor and the purchaser shall create an express warranty that the improvement conforms to such affirmation or promise; (2) any written description of the improvement, including plans and specifications thereof which is made a part of the basis of the bargain between the vendor and the purchaser shall create an express warranty that the improvement conforms to such description; and (3) any sample or

model which is made a part of the basis of the bargain between the vendor and the purchaser shall create an express warranty that the improvement conforms substantially to such sample or model.

"(b) No formal words, such as 'warranty' or 'guarantee', nor any specific intention to make a warranty shall be necessary to create an express warranty, provided a simple affirmation of the value of the improvement or a statement purporting to be an opinion or commendation of the improvement shall not of itself create such a warranty.

"(c) No words in the contract of sale or the deed, nor merger of the contract of sale into such deed shall exclude or modify any express warranty made pursuant to subsection (a) of this section. Such warranty may, at any time after the execution of the contract of sale, be excluded or modified wholly or partially by any written instrument, signed by the purchaser, setting forth in detail the warranty to be excluded or modified, the consent of the purchaser to such exclusion or modification and the terms of the new agreement.

"(d) An express warranty shall terminate: (1) In the case of an improvement completed at the time of the delivery of the deed to the purchaser, one year after the delivery or one year after the taking of possession by the purchaser, whichever occurs first; and (2) in the case of an improvement not completed at the time of delivery of the deed to the purchaser, one year after the date of the completion or one year after taking of possession by the purchaser, whichever occurs first."

General Statutes § 47-118 provides: "Implied warranties. (a) In every sale of an improvement by a vendor to a purchaser, except as provided in subsection (b) of this section or excluded or modified pursuant to subsection (d), warranties are implied that the improvement is: (1) Free from faulty materials; (2) constructed according to sound engineering standards; (3) constructed in a workman-like manner, and (4) fit for habitation, at the time of the delivery of the deed to a completed improvement, or at the time of completion of an improvement not completed when the deed is delivered.

"(b) The implied warranties of subsection (a) of this section shall not apply to any condition that an inspection of the premises would reveal to a reasonably diligent purchaser at the time the contract is signed.

"(c) If the purchaser, expressly or by implication, makes known to the vendor the particular purpose for which the improvement is required, and it appears that the purchaser relies on the vendor's skill and judgment, there is an implied warranty that the improvement is reasonably fit for the purpose.

"(d) Neither words in the contract of sale, nor the deed, nor merger of the contract of sale into the deed is effective to exclude or modify any implied warranty; provided, if the contract of sale pertains to an improvement then completed, an implied warranty may be excluded or modified wholly or partially by a written instrument, signed by the purchaser, setting forth in detail the warranty to be excluded or modified, the consent of the purchaser to exclusion or modification, and the terms of the new agreement with respect to it.

the chimneys, decks and roofs.[9] The complaint stated a number of other claims against Seventh BRT specifically in relation to the sewage treatment plant, including: (1) breach of the express and implied warranties provided in the CIOA and the NHWA; (2) fraudulent concealment; (3) fraudulent misrepresentation; (4) wilful and wanton misrepresentation; (5) CUTPA violations; (6) breach of the duty of care; and (7) unity of interest among Seventh BRT, Danbury and Little Rock.[10] The complaint also alleged that Condominium Management Group breached its contract in that it had failed to operate and maintain the plant properly. The defendant answered by denying the essential allegations of the complaint and asserting various statutes of limitations as a special defense to all of the plaintiff's claims.

In connection with the various defects alleged by the plaintiff, the record reveals the following evidence. The on-site sewage treatment plant,[11] which was designed by Consultants and Engineers, Inc., was constructed for the exclusive use of the complex and served all of the units. The state department of environmental protection (department) conducted a preliminary

---

"(e) The implied warranties created in this section shall terminate: (1) In the case of an improvement completed at the time of the delivery of the deed to the purchaser, one year after the delivery or one year after the taking of possession by the purchaser, whichever occurs first; and (2) in the case of an improvement not completed at the time of delivery of the deed to the purchaser, one year after the date of the completion or one year after taking of possession by the purchaser, whichever occurs first."

[9] The trial court eventually directed a verdict in favor of the defendants for claims relating to the paving, and permitted the jury to consider the issue of damages for claims relating to defects in the residential buildings, but only as to those units that had been sold to BRT Property Group or had been retained by Seventh BRT and then had been sold to individual purchasers within three years of the filing of the action.

[10] The trial court directed a verdict in favor of the defendants on the claim of wilful and wanton misrepresentation (count seven of the complaint) and breach of the duty of care (count nine of the complaint).

[11] This "community sewerage system" was proposed in accordance with General Statutes § 7-245.

review of the treatment plant project and made suggestions that were incorporated by Consultants and Engineers, Inc., prior to approval of the final plan by the department. Upon completion of the plant, the department conducted a final inspection to determine whether the plant had been built in accordance with the approved plans and specifications. The plant began operating in November, 1985, pending approval by the department. A five year permit to operate the plant was issued by the department on May 15, 1986. A second permit was issued on May 11, 1993.

Roman Platosh, an expert in the design of sewage treatment plants, testified that he had inspected the plant in January, 1993, and had found that "[t]he conditions were deplorable . . . . There's a building exhaust fan which was not in use. The vapor inside the building looked as if it was on fire from all the fog inside. Heavy odors in the buildings. Much of the equipment was rusting. I remember seeing the control panel with the doors open and wires hanging off of it. . . . [A]t that time the sand filters were not operational. They were being bypassed. Very heavy solids going over in the effluent. Everything was basically slimy. I was afraid to touch anything, including the hand rails. It was very dingy." Platosh further testified that the design of the plant was deficient in that: (1) it did not provide adequate flow equalization in order to provide sewage flow into the treatment plant at a uniform or nearly uniform rate; (2) a single blower served two tanks causing (a) improper oxygen distribution in that the unit that was furthest away from the blower was oxygen starved, and (b) lack of "proper redundancy" in that the unit that was furthest away from the blower could not be operated if the other unit malfunctioned; (3) improper pacing of the chemical feed to the influent pump; and (4) the influent pump station pumped in sewage at a higher rate than the capacity of the treatment plant.

McDonald, one of the original defendants in this action, was vice president of construction for Seventh BRT and oversaw the construction of the sewage treatment plant. He was the "principal contact" between Seventh BRT and Consultants and Engineers, Inc., the designer of the plant. In addition, McDonald was a management agent with Condominium Management Group,[12] a division of Little Rock, which was also one of the original defendants in this action. He also served on the board of directors of the association from August, 1987, until 1992. Little Rock, which was the general contractor for the Willow Springs project, subsequently became BRT Property Group. BRT Property Group was the entity that bought ninety-two units from Seventh BRT in 1992. McDonald ceased working for Little Rock in October, 1993.

Walter Sinnott, a senior sanitary engineer with the department, testified that from the time the permit to operate was issued until January 1, 1991, there were "upsets" three or four times a year during which the plant would exceed the limits set out in the permit. From January 1, 1991, until June, 1992, there were "serious effluent violations." McDonald testified that he was aware of a number of problems with the plant from May, 1986, until 1991. In addition to technical problems, there were numerous complaints of unpleasant odors emanating both from the plant and from the adjacent landfill. In April, 1988, McDonald received a letter from Richard Finn, who was managing the plant at that time, detailing a number of problems. McDonald forwarded the letter to Consultants and Engineers, Inc., but took no further action on it himself. On June 9, 1994, the department sent a letter to Arthur Stueck II, who was the property manager at that time, informing him that

---

[12] Corporate Property Management, Inc., took over management of the complex from Condominium Management Group in January, 1991, and managed the property for less than one year. See footnote 13 of this opinion.

a pollution abatement order would be issued ordering the plant to correct "chronic permit violations."

McDonald acknowledged that the plant experienced "phenomenal" flow surges on weekends. The influent pump chamber was equipped with floats that triggered a high water alarm and turned on the pumps when the water reached a certain level. Had the pumps turned on at the level for which they were originally set, 140 gallons per minute might be pumped into the plant, thereby inundating it. In order to prevent this problem, McDonald adjusted the float mechanisms to prevent the high water alarms from going off and to delay the pumps from turning on as they normally would. McDonald could not recall informing the board about the surge equalization problems with the plant, although he was aware of them. When residents of Willow Springs complained about unpleasant odors from the plant, his response was often to invite them to tour the plant. Robert Davenport, a Willow Springs homeowner who was a member of the association's executive board from December, 1989, until the time of trial, testified that board members regularly inquired as to the condition and operation of the treatment plant and that McDonald was generally the person who responded to those questions. Davenport further testified that, although he regularly attended board meetings, he had never heard McDonald, Nahom or LaCroce refer to the equalization or surge problems at the plant.

In addition to the sewage treatment plant, there were also problems with other condominium structures. The plaintiff alleged that the paving was inadequate, that the decks did not conform to the design and were constructed with untreated lumber, that the clothes dryer vents were improperly installed, and that the box chimneys were improperly constructed. These defects resulted in extensive damage and repairs.

The plaintiff alleged that the chimney stacks were improperly constructed and inadequately anchored to the roofs. David A. Lathrop, a fire marshal for the town of New Milford, testified that he was called to Willow Springs on April 4, 1995, because three large wooden chimney shafts had become detached from their footings. Upon inspecting these chimneys, he found that they had been anchored primarily with tenpenny nails instead of lag bolts and that they "weren't adequately anchored to withstand gusting wind loads." The nails went through two-by-fours and then into the roof sheathing, which consisted of one-half inch plywood.

Stueck, of REI Property Management Company,[13] testified that the chimneys were originally attached only with nails and that, after a chimney had fallen off the roof in 1992 during a storm, lag bolts were added to certain of the chimneys that were actually loose and deemed to be most at risk of falling. Those chimneys that were freestanding in the middle of the roofs were tested using what Stueck referred to as a "resistance test," which apparently consisted of manually jiggling the selected chimneys to see if they had "a lot of play" in them. He further testified that he was concerned both about additional property damage and about possible injuries that might result if these large heavy structures were not properly anchored. After consulting with the building department of the town of New Milford regarding the appropriate remedy for this problem, Stueck arranged to have approximately one half of the chimneys in the complex anchored with lag screws or lag bolts. One of those chimneys eventually fell off the roof in 1995. Stueck admitted that adding lag bolts in 1992 did not solve the structural problems that caused the chimneys to fall off the roofs.

---

[13] REI Property Management Company began serving as the property manager for Willow Springs on December 1, 1991.

Paul K. Taormina, a registered mechanical and civil engineer, who was hired by Stueck and who inspected and evaluated the chimneys, testified that the building code in effect at the time the complex was built required the chimneys to be able to withstand seventy-five mile per hour winds and that "[t]here's no way that chimney could stand up to [that wind speed]." He further testified that the chimneys were fourteen feet tall and weighed approximately 600 pounds. Taormina recommended that each of the freestanding chimneys be anchored by four-by-four posts with steel angles that would be attached to the chimney and would connect to the first floor of the building. Ellis Tarlton of Kenosia Construction testified that 140 chimneys needed to be repaired according to Taormina's specifications, at an estimated cost of $1780 per chimney. He also testified that he did not know if this would enhance the value of the property beyond what it was before it was damaged.

In addition, the plaintiff claimed that the decks were improperly constructed. Stueck testified that, in 1994, during the course of an ongoing program to replace rotten deck boards, he told the association that he suspected more extensive repairs might have to be done to correct "problems that lied beneath the surface." Several decks were dismantled in order to determine if there were structural defects hidden beneath the vinyl and aluminum siding in which they were wrapped. Stueck testified that every deck that was examined in this manner exhibited problems, such as "rot in the building, rot in the supporting structure, no footings, rotted posts. The post and beam construction, which . . . was wrapped in aluminum . . . was holding water so that the beam was also rotted."

Taormina testified that the specifications for the decks indicated that they should be built with pressure treated lumber and that the support columns should rest on concrete footings that extend from three and

one-half feet below the surface to several inches above grade. He further testified that he did not find a single deck that had footings of any kind, that he did not find that any pressure treated lumber had been used, that the lack of gutters and the flatness of the decks caused the decks to accumulate water, and that the sheathing used to cover certain portions of the decks caused them to retain moisture and, ultimately, to rot. The repair contract with Kenosia Construction indicated that there were three types of decks, type A, type B and type C. The cost of repairing the 136 type A decks was estimated at $3096 per deck for a total of $421,056. The cost of repairing the thirty type B decks was estimated at $2723 per deck for a total of $81,690. The cost of repairing the eight type C decks was estimated at $2995 per deck for a total of $23,960. These prices were based upon 1995 figures and did not include an estimate of whether or how much the value of the property would be enhanced by these repairs. At the time of trial, thirty-five decks had been replaced.

In 1995, a preexisting plan for piecemeal replacement of portions of the pavement was abandoned in favor of a total replacement plan. It was determined that the problems with the pavement, including severe cracking and sink holes, existed throughout the complex and that it was inefficient to repair the same areas repeatedly. It was determined that it would be less expensive to use new, as opposed to partially reclaimed, materials. The cost of replacing the pavement using new materials was $65,763.

The plaintiff claimed that the roofs were improperly constructed, resulting in extensive damage. From 1991 until the time of trial, 76 of 166 roofs experienced leaks. As these roofs were being repaired, various problems were discovered, including missing tar paper, inadequate weather shield and flashing, and shingles that did not reach the roof line. As a result of these defects, the

roofs leaked and the sheathing underneath them rotted. Although these leaks were repaired in a piecemeal fashion as they arose, the association was unable to initiate a major roof replacement program due to financial constraints. Stueck, the property manager who oversaw the roof repairs from December, 1991, to the time of trial, testified that "[w]ith all the serious physical elements that are failing on the complex, it's difficult to pick which one to fully correct and which ones to put Band-Aids on." No evidence was presented to show the costs of prior repairs or to estimate the cost of replacing the existing roofs.

The plaintiff also claimed that the dryer vents had been improperly constructed, resulting in extensive damage. The property manager testified that numerous complaints concerning water leaks and dryers that either malfunctioned or caught fire were eventually traced to problems with the dryer vents. The complex consists of buildings that have one-story lower units and two-story upper units. Each unit is served by one dryer vent and one bathroom vent. It was discovered that the vents for the lower units did not vent to the outside of the building but, instead, opened into an enclosed area beneath the first floor roof line where moisture accumulated, causing leaks and rotted roofs. Additionally, because the dryer vent pipes were constructed of flexible materials and ran over long distances, lint would accumulate and clog the pipes, causing the dryers to malfunction and occasionally to catch fire. Repairing these problems required the vent pipes to be extended to the outside of the buildings and, on occasion, necessitated the removal of sheetrock to expose the venting system in order to replace the flexible pipe with hard piping. The association hired a handyman to install the exterior vents, for which they supplied the materials and paid $17 per hour in labor. The jury heard extensive evidence, including expert

testimony, regarding materials and construction defects in the dryer vents. There was also a substantial amount of photographic evidence and testimony detailing the location and cause of the damage. Additionally, the plaintiff introduced into evidence two bills for repairs performed on the vents: one for $836.26, and another for $2977.34.

At the close of evidence regarding the chimneys, paving, roofs, decks and dryer vents, the trial court granted the defendants' motion for a directed verdict with respect to the paving because that claim for damages was barred by the statute of limitations. Consequently, the trial court instructed the jury that it was not to award damages for that claim. In addition, the court directed a verdict in favor of the defendants on counts seven and nine of the complaint, which alleged wilful and wanton misrepresentation and breach of the defendants' duty of care relating to the sewage plant. The court also limited the defendants' liability relating to the chimneys, roofs, decks and dryer vents to: (1) those units sold to BRT Property Group in 1987 that were then sold to individual purchasers starting in 1991; and (2) those units retained by Seventh BRT and then sold to individual purchasers during the three years next preceding the commencement of this action.[14] The court concluded that claims regarding these identified units were not barred by the three year limitation period provided in General Statutes (Rev. to 1995) § 47-277. The parties stipulated that, should the jury find the defendants liable with respect to those units, it could consider damages for fifty-two decks, forty-six dryer vents, and thirty-eight chimneys. The jury was instructed, however, that it could award only nominal

---

[14] The plaintiff introduced into evidence a number of deeds showing that from December 12, 1991, to October 3, 1994, BRT Property Group sold thirty units to individual purchasers, and that from November 19, 1990, to February 20, 1992, Seventh BRT sold seven units to individual purchasers.

damages for the roofs because the plaintiff had presented insufficient evidence of damages.

The jury, having answered forty interrogatories,[15] found all of the defendants liable except for Martin Lillis and LaCroce, and awarded the following damages against Seventh BRT totaling $881,281: $61,000 for the chimneys; $140,000 for the decks; $348,998 for the roofs; $79,000 for the vents; $156,600 for the sewage treatment plant; and $95,683 for fraudulent concealment. The jury also awarded $40,000 against McDonald, $500 against Nahom, $40,000 against Condominium Management Group, and $60,000 against Consultants and Engineers, Inc.

The answers to the interrogatories reveal that the jury determined that Seventh BRT had: (1) breached the implied and express warranties under the CIOA and the NHWA, and that those claims were not barred by the statute of limitations; (2) fraudulently concealed information regarding the sewage treatment plant in order to delay the plaintiff's filing of the action; (3) made representations regarding the condition of the plant that were untrue or with reckless disregard as to whether they were untrue; (4) knowingly and purposefully misrepresented the condition of the treatment plant and concealed information regarding the plant from the unit owners and the association; and (5) violated CUTPA. In addition, the jury determined that there was a unity of interest between Seventh BRT, Little

---

[15] Practice Book § 312, now Practice Book (1998 Rev.) § 16-18, provides: "Interrogatories

"The court may submit to the jury written interrogatories for the purpose of explaining or limiting a general verdict, which shall be answered and delivered to the clerk as a part of the verdict. The clerk will take the verdict and then the answers to the several interrogatories, and thereafter the clerk will take the court's acceptance of the verdict returned and the questions as answered, and proceed according to the usual practice. The court will not accept a verdict until the interrogatories which are essential to the verdict have been answered."

Rock and Danbury, and that Condominium Management Group, had breached its management contract with the association.

The defendants filed a motion to set aside the verdict and for judgment notwithstanding the verdict. The trial court denied the motion with respect to all claims except for those related to the roofs. That award was reduced from $348,998 to $100, because it contravened the trial court's prior explicit instruction to award only nominal damages for that claim. The verdict against Seventh BRT was thereby reduced to $532,393. The court declined to set aside the verdict on the remaining claims. On September 5, 1996, the court awarded $172,527.29 in interest against Seventh BRT, Little Rock, Danbury, and Condominium Management Group. Thereafter, the court awarded $100,000 in punitive damages against these defendants and, in addition, awarded the plaintiff $81,508 in attorney's fees.

## II

Seventh BRT has made numerous claims on appeal. We must note at the outset that it is difficult at times to determine whether it is challenging the jury instructions, the denial of its motions for a directed verdict, the denial of its motions to set aside the verdict and for judgment notwithstanding the verdict, or the sufficiency of the evidence. This difficulty is compounded by the fact that Seventh BRT has not complied with Practice Book § 4064C (d), now Practice Book (1998 Rev.) § 67-4 (d),[16] which requires an appellant to include a brief statement of the standard of review for each

---

[16] Practice Book § 4064C (d), now Practice Book (1998 Rev.) § 67-4 (d), provides in relevant part: "The argument, divided under appropriate headings into as many parts as there are points to be presented, with appropriate references to the statement of facts or to the page or pages of the transcript or to the relevant document. The argument on each point shall include a separate, brief statement of the standard of review the appellant believes should be applied. . . ."

claim. Additionally, we note that "appellate pursuit of so large a number of issues forecloses the opportunity for a fully reasoned discussion of pivotal substantive concerns [by the appellant]. A shotgun approach does a disservice both to this court and to the party on whose behalf it is presented." *Latham & Associates, Inc.* v. *William Raveis Real Estate, Inc.*, 218 Conn. 297, 300, 589 A.2d 337 (1991).

As nearly as we can determine, Seventh BRT has claimed that: (1) the jury charge as a whole failed to represent the law accurately because it did not distinguish between the plaintiff's claims or resolve the issues in a logical manner and because it was "unintelligible";[17] (2) the court failed to find that counts one and two, alleging breach of express and implied warranties pursuant to General Statutes §§ 47-274 and 47-275, were time barred by General Statutes § 47-277 in that (a) the court improperly allowed the jury to find an explicit extension of the warranty relating to the sewage plant pursuant to § 47-277 (c), and (b) the court improperly instructed the jury that, if it found that BRT Property Group had owned six or more condominium units, no bona fide purchase had taken place with respect to those units in 1987; (3) the court improperly allowed the plaintiff to bring claims relating to common elements under the NHWA because (a) that act does not apply to common elements of a condominium complex organized pursuant to the CIOA, and (b) the claims were barred by the statute of limitations; (4) the plaintiff's affirmative claim for fraudulent concealment was insufficient to serve as a reply to Seventh BRT's special defense that the claims were barred by the statute of limitations; (5) the court improperly treated count five as both an affirmative claim of fraud by concealment

---

[17] Seventh BRT appears to have raised this argument in two different sections of its brief. Because the same or similar issues are raised in both instances, we treat them together.

and as a mechanism for tolling of the statute of limitations; (6) the court improperly allowed the jury to consider the plaintiff's claim of fraudulent misrepresentation (count six of the complaint) because it should have been charged out of the case on statute of limitations grounds along with counts seven and nine, which the court determined were time barred; (7) the court improperly allowed the jury to award damages under CUTPA because (a) the count alleging the basis for the CUTPA violation had been charged out of the case as barred by the statute of limitations, and (b) the statute of limitations for CUTPA had expired; (8) the court improperly allowed the jury to find that a unity of interest existed between Seventh BRT, Danbury and Little Rock; (9) the court improperly awarded offer of judgment interest against Condominium Management Group; and (10) there was insufficient evidence upon which to base the jury's award of damages in that (a) there was no evidence presented as to diminution in value of the property, (b) the repair estimates introduced by the plaintiff were not based on the appropriate time period, and (c) it was inappropriate to allow damages for the vents because they were not claimed in the complaint and there was insufficient evidence to support the award. We reject each of these claims.

## A

### Jury Charge

Seventh BRT's first claim is that the jury instructions were "unintelligible" as a whole and failed to represent the law accurately. The plaintiff argues that this issue was not preserved for appeal. We agree. "This court will not consider claimed errors on the part of the trial court unless it appears that the question was distinctly raised at the trial . . . . *State* v. *Simms*, 170 Conn. 206, 208, 365 A.2d 821, cert. denied, 425 U.S. 954, 96 S. Ct. 1732, 48 L. Ed. 2d 199 (1976) . . . ." *State* v. *Groomes*,

232 Conn. 455, 465, 656 A.2d 646 (1995). Practice Book § 315, now Practice Book (1998 Rev.) § 16-20, provides that a claim of error in a jury charge may be preserved either by making a specific request to charge or by excepting properly to the charge as given.[18] "In order properly to preserve for appeal a claimed error in the trial court's charge to the jury, a party must take an exception when the charge is given that distinctly states the objection and the grounds therefor." *State* v. *Miller*, 186 Conn. 654, 657, 443 A.2d 906 (1982); *State* v. *Callari*, 194 Conn. 18, 25, 478 A.2d 592 (1984), cert. denied, 469 U.S. 1210, 105 S. Ct. 1178, 84 L. Ed. 2d 327 (1985). The defendant did submit preliminary and final requests to charge, excepted generally to "all" instructions and excepted specifically to a number of instructions. In none of the exceptions, however, did Seventh BRT complain that the jury charge, as a whole, was in any way incoherent or unintelligible.[19] The blanket exception to "all" the instructions does not comply with the requirements of § 315 because it does not state the grounds for objection.[20] We, therefore, decline to address this claim.

B

CIOA

Counts one and two of the complaint alleged that Seventh BRT had violated the express warranties in the

---

[18] Practice Book § 315, now Practice Book (1998 Rev.) § 16-20, provides in relevant part: "The supreme court and the appellate court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state the specific matter objected to and the ground of objection. . . ."

[19] We address, elsewhere in this opinion, specific exceptions that are relevant to other issues on appeal.

[20] We note that the case was tried on an issue-by-issue basis and that the court charged separately on each count of the complaint. Additionally, each juror was given a notebook that had been organized according to the issues

CIOA and the NHWA with respect to the treatment plant, as well as the implied warranties of those acts with respect to both the treatment plant and the defects in the residential buildings. In its answer, Seventh BRT asserted the statute of limitations as a special defense to all of the plaintiff's claims. The answers to interrogatories reveal that the jury found that Seventh BRT had breached the implied and express warranties of both acts, and determined that none of these claims was barred by the statute of limitations.

Seventh BRT claims that, because the plaintiff has claimed breach of warranty under the CIOA[21] with respect to elements of the complex that are not part of the individual units but are instead "common elements" as defined by the General Statutes § 47-202 (4), the three year statute of limitations provided in § 47-277[22] began to run for all defects claimed by the plaintiff

presented, for the purpose of taking notes during the trial. These measures served to decrease the chances that the jury would become confused by the complex facts and legal issues presented in this case.

[21] Because we conclude that the jury properly could have found Seventh BRT liable for breach of warranty under the CIOA, we do not reach the claims regarding the NHWA.

[22] General Statutes (Rev. to 1995) § 47-277 provides: "Action for breach of warranty. Statute of limitations. (a) A judicial proceeding for breach of any obligation arising under section 47-274 or 47-275 shall be commenced within three years after the cause of action accrues.

"(b) Subject to subsection (c) of this section, a cause of action for breach of warranty of quality, regardless of the purchaser's or association's lack of knowledge of the breach, accrues: (1) As to a unit, at the time the purchaser to whom the warranty is first made enters into possession if a possessory interest was conveyed or at the time of acceptance of the instrument of conveyance if a nonpossessory interest was conveyed; and (2) as to each common element, at the time the common element is completed and first used by a bona fide purchaser.

"(c) If a warranty of quality explicitly extends to future performance or duration of any improvement or component of the common interest community, the cause of action accrues at the time the breach is discovered or at the end of the period for which the warranty explicitly extends, whichever is earlier."

We note that this statute was amended in 1995, adding the phrase "[u]nless a period of limitation is tolled under section 47-253" at the beginning of

when the first unit was sold in 1985. Seventh BRT further argues that the last of the units was sold to a purchaser when, in 1987, it transferred ninety-two units to BRT Property Group, and that this action, which was filed more than three years later, in 1993, is therefore time barred. The plaintiff has advanced several arguments to overcome this defense. With respect to the express and implied warranty claims relating to the sewage treatment plant, the plaintiff argued at trial that the statute of limitations contained in § 47-277 had been tolled because Seventh BRT fraudulently concealed the cause of action and, alternatively, that the warranty had been expressly extended as provided in § 47-277 (c). With respect to the implied warranty claims relating to the residential buildings involving the chimneys, decks, roofs and vents, the plaintiff argued that the cause of action accrued within the limitations period provided in § 47-277 (c) as to the units that were sold by BRT Property Group and by Seventh BRT within three years of the commencement of this action.

We first address Seventh BRT's claims under the CIOA with respect to the defects in the residential buildings. The court instructed the jury that the claim for the chimneys, decks, roofs and vents in the units sold to BRT Property Group in 1987 would not be barred by the statute of limitations if the jury determined that BRT Property Group owned six or more units, because BRT Property Group would then not be considered a "purchaser" under the CIOA. The court reasoned that, because the claims do not accrue under the CIOA until the unit is sold to a "purchaser," the breach of warranty claims would not accrue when the ninety-two units

---

subsection (a). Public Acts 1995, No. 95-187, § 25. General Statutes § 47-253 (d) provides in relevant part: "Any statute of limitation affecting the association's right of action against a declarant under this chapter is tolled until the period of declarant control terminates. . . ." That section is irrelevant to the present appeal and we do not address it.

were sold to BRT Property Group but would instead begin to run when BRT sold the units to individual buyers.[23] Because these units were sold to "purchasers," as that term is defined by § 47-202 (25), within three years of the filing of the action for breach of warranty, the claims would not be barred by the statute of limitations. Seventh BRT claims that the court misinterpreted the CIOA when it determined that the claims regarding limited common elements would not be time barred if the jury decided that BRT Property Group had bought six or more units. We agree with the trial court.

The resolution of this issue requires us to interpret the provisions of the CIOA as they relate to the accrual of breach of warranty claims. Statutory construction is a question of law and therefore our review is plenary. *North Haven* v. *Planning & Zoning Commission*, 220 Conn. 556, 561, 600 A.2d 1004 (1991). "[T]he process of statutory interpretation involves a reasoned search for the intention of the legislature." (Internal quotation marks omitted.) *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). "As with any issue of statutory interpretation, our initial guide is the language of the statute itself. . . ." (Citations omitted; internal quotation marks omitted.) *Herbert S. Newman & Partners* v. *CFC Construction Ltd. Partnership*, 236 Conn. 750, 756, 674 A.2d 1313 (1996). Furthermore, we interpret statutory language in light of the purpose and policy behind the enactment. *State* v. *Pieger*, 240 Conn. 639, 646, 692 A.2d 1273 (1997); *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.*, 238 Conn. 216, 234, 680 A.2d 127 (1996), cert. denied, 520 U.S. 1103, 117 S. Ct. 1106, 137 L. Ed. 2d 308 (1997). "In construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended." *Kron* v. *Thelen*, 178 Conn. 189, 192, 423 A.2d 857 (1979). In order to determine the meaning of a

---

[23] See footnote 14 of this opinion.

statute, we must consider the statute as a whole when reconciling its separate parts in order to render a reasonable overall interpretation. *Broadley* v. *Board of Education*, 229 Conn. 1, 6, 639 A.2d 502 (1994); *Eighth Utilities District* v. *Manchester*, 176 Conn. 43, 50, 404 A.2d 898 (1978). "[W]here the same words are used in a statute two or more times they will ordinarily be given the same meaning in each instance." (Internal quotation marks omitted.) *Weinberg* v. *ARA Vending Co.*, 223 Conn. 336, 343, 612 A.2d 1203 (1992).

Willow Springs was organized pursuant to the CIOA by the declarant,[24] Seventh BRT. The CIOA divides condominium property interests into three categories: common elements; limited common elements; and units. " 'Unit' means a physical portion of the common interest community designated for separate ownership or occupancy, the boundaries of which are described" in the declaration. General Statutes § 47-202 (31). Common elements are "all portions of the common interest community other than the units . . . ." General Statutes § 47-202 (4) (A) (i). " 'Limited common element' means a portion of the common elements allocated by the declaration . . . for the exclusive use of one or more but fewer than all of the units." General Statutes § 47-202 (19). General Statutes § 47-221 (2) provides in part that "[i]f any chute, flue, duct . . . or any other fixture lies partially within and partially outside the designated boundaries of a unit, any portion thereof serving only that unit is a limited common element allocated solely

---

[24] " 'Declarant' means any person or group of persons acting in concert who (A) as part of a common promotional plan, offers to dispose of his interest in a unit not previously disposed of or (B) reserves or succeeds to any special declarant right." General Statutes § 47-202 (12). Because Seventh BRT is without question the "declarant" of Willow Springs, claims for breach of warranty pursuant to §§ 47-274 and 47-275 relating to units retained by Seventh BRT and then sold to bona fide purchasers within the three years next preceding the commencement of this action are not barred by the statute of limitations provided in § 47-277.

to that unit. . . ." The sewage treatment plant and the paving are, therefore, common elements because they are for the use of all of the units. The chimneys, decks, roofs and vents are limited common elements because they are for the use of fewer than all of the units and are not part of each unit as described in the declaration.

The statute of limitations for breach of implied or express warranties under the CIOA is three years from the date on which the cause of action accrues, "regardless of the purchaser's or association's lack of knowledge of the breach." General Statutes § 47-277 (b). The accrual date depends on whether the defects complained of are contained in units or common elements. A cause of action accrues as to "units" when "the *purchaser* to whom the warranty was first made enters into possession . . . ." (Emphasis added.) General Statutes (Rev. to 1995) § 47-277 (b) (1). A cause of action accrues as to common elements "at the time the common element is completed and first *used* by a *bona fide purchaser*." (Emphasis added.) General Statutes (Rev. to 1995) § 47-277 (b) (2). There is no separate accrual provision for limited common elements. A "purchaser" is defined as someone "other than a declarant or a dealer . . . ." General Statutes § 47-202 (25). A "dealer" is someone "who owns either six or more units, or fifty per cent or more of all the units . . . ." General Statutes § 47-202 (11).

Seventh BRT argues that limited common elements are a subset of common elements and that the cause of action for defects in the limited common elements, therefore, accrued when the first unit was used by a bona fide purchaser, which occurred in 1985 when the first unit was sold. The essence of Seventh BRT's claim is that the definition of a "purchaser" contained in § 47-202 (25) applies to the accrual provision for units set forth in § 47-277 (b) (1), but not to the accrual provision for common elements in § 47-277 (b) (2). Seventh BRT

reasons that, although § 47-277 (b) (1) uses the term "purchaser," § 47-277 (b) (2) uses the phrase "bona fide purchaser" and that this phrase must be read as a whole, as it is in the context of the Uniform Commercial Code (UCC). See General Statutes § 42a-8-302. At common law and under the UCC, a bona fide purchaser is one who purchases in good faith, for value and without notice of adverse claims. See General Statutes § 42a-8-302; *Hayden* v. *Charter Oak Driving Park*, 63 Conn. 142, 147, 27 A. 232 (1893).[25] Seventh BRT maintains that the definition of "purchaser" in § 47-202 (25) should not be grafted onto the phrase "bona fide purchaser," which has an independent legal meaning. Seventh BRT further argues that BRT Property Group purchased the ninety-two units in question for $4.74 million, which constitutes "value" and that there was no testimony showing that the units were not purchased in good faith or that BRT Property Group had notice of adverse claims.

The plaintiff argues, to the contrary, that the definition of "purchaser" contained in § 47-202 (25) applies to the accrual provision in § 47-277 (b) (2). We agree. There can be no clearer guide to the interpretation of a statutory term than the meaning assigned to it in the definitional section of the same statute. Where words of a statute are clear we presume that they accurately reflect the legislature's intent. *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, 234 Conn. 624, 642, 662 A.2d 1251 (1995). Furthermore, there is no reason to suppose that the legislature intended that the phrase "bona fide purchaser," as it is generally understood, would not be further modified by the specific definition of "purchaser" contained in § 47-202

[25] The court, in fact, instructed the jury as to the UCC definition of a bona fide purchaser and then went on to state that the term purchaser was further limited by the CIOA as described previously.

(25). It would run contrary to traditional rules of statutory interpretation to assign different meanings to the word "purchaser" when used in different subsections of the same statute. See *Broadley* v. *Board of Education,* supra, 229 Conn. 6 (consider statute as whole when interpreting separate parts); *Weinberg* v. *ARA Vending Co.,* supra, 223 Conn. 343 (words used two or more times generally assigned same meaning). If the legislature had intended to exclude § 47-277 (b) (2) from the definition provided in § 47-202 (25), it could have done so explicitly. Furthermore, there is no inherent inconsistency in requiring a purchaser for value without notice of adverse claims to be neither a declarant nor a dealer in order for a warranty claim to accrue.

The purpose of the CIOA is to provide developers, lenders and title insurers with flexibility and certainty in establishing common interest communities, as well as providing prospective unit owners and unit owners' associations with consumer protection rights such as disclosure and warranty rights. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 6, 1983 Sess., pp. 1821–23, remarks of William Breetz. It is consistent with the underlying purposes of the CIOA to ensure that warranty claims not accrue in favor of bulk purchasers. As the plaintiff points out, under Seventh BRT's interpretation, a declarant could completely evade these warranty provisions by transferring all of the units to an affiliated entity that would hold them for rental for three years prior to selling them to individual purchasers. This is hardly consistent with the statutory purpose of providing individual unit owners with consumer protection rights. "We must avoid a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve. . . . It is also a rule of statutory construction that those who promulgate statutes or rules do not intend to promulgate statutes or rules that lead to absurd consequences

or bizarre results." (Citations omitted; internal quotation marks omitted.) *State* v. *Spears*, 234 Conn. 78, 92, 662 A.2d 80, cert. denied, 516 U.S. 1009, 116 S. Ct. 565, 133 L. Ed. 2d 490 (1995).[26] We, therefore, conclude that the trial court correctly instructed the jury that it was required to find that the breach of warranty claims under the CIOA for the limited common elements were not barred by the statute of limitations contained in § 47-277 if it determined that BRT Property Group owned six or more units.[27]

## C

## Fraudulent Concealment

We turn next to Seventh BRT's claims regarding the sewage treatment plant. The plaintiff, in counts one

---

[26] There is an additional requirement in § 47-277 that neither party has addressed in its briefs, although it was raised in Seventh BRT's supplemental motion for a directed verdict. A claim with respect to any element other than a unit cannot, by the express terms of § 47-277, accrue before that element is *used* by the "purchaser." Limited common elements are, by definition, allocated for the *use* of one or more but fewer than all the units. General Statutes § 47-202 (19). Seventh BRT's claim in its motion for a directed verdict, that the term "use" may be broadly defined as deriving benefit, is unavailing. First, it would be illogical to assume that the term "use" as employed in the definitional section of the statute means anything but actual use because, theoretically, each unit derives some incremental value from all common elements and limited common elements. Second, the defendant's proffered definition renders the statutory distinction between the accrual of a cause of action for units and common elements meaningless. "[P]rinciples of statutory construction . . . require us to construe a statute in a manner that will not thwart its intended purpose or lead to absurd results. . . . We must avoid a construction that fails to attain a rational and sensible result that bears directly on the result that the legislature sought to achieve." (Citation omitted; internal quotation marks omitted.) *State* v. *DeFrancesco*, 235 Conn. 426, 436–37, 668 A.2d 348 (1995). A claim relating to a limited common element, therefore, does not, as Seventh BRT argues, accrue when the first unit is sold to a bona fide purchaser but, rather, accrues when a unit for whose use that element is allocated is first sold to a bona fide purchaser.

[27] Seventh BRT claims on appeal that the trial court improperly allowed the jury to apply the NHWA to limited common elements of a condominium complex organized under the CIOA. Specifically, it claims that the NHWA

and two of the complaint, alleged that Seventh BRT breached the express and implied warranties provided in the CIOA[28] with respect to the plant. Seventh BRT raised the three year statute of limitations contained in § 47-277 as a special defense to the plaintiff's claims related to the plant. The plaintiff, in turn, advanced two arguments at trial in response to the statute of limitations defense. First, the plaintiff argued that the statute of limitations was tolled with respect to the plant because Seventh BRT had fraudulently concealed the cause of action. Second, the plaintiff argued that the warranty had been expressly extended by Seventh BRT.[29] The answers to the interrogatories indicate that the jury found that the statute of limitations was tolled with respect to the plant because Seventh BRT had fraudulently concealed the cause of action.[30]

On appeal, Seventh BRT raises two issues with respect to the plaintiff's claim of fraudulent concealment. First, it argues that the plaintiff may not assert fraudulent concealment as a tolling mechanism because that claim was not properly pleaded. Second, it argues that fraudulent concealment cannot serve both as a tolling mechanism and also as an affirmative claim for relief.

In count five of the complaint, the plaintiff alleged that Seventh BRT had fraudulently concealed the defec-

---

by its terms applies only to "units" and, therefore, cannot apply to common elements or limited common elements. We decline to address this issue because the jury specifically awarded damages for breach of warranty on independent grounds pursuant to the CIOA.

[28] See footnote 7 of this opinion.

[29] The plaintiff need only allege and prove one permissible basis for avoiding the statute of limitations. Because we conclude that Seventh BRT may not challenge the jury's finding with respect to fraudulent concealment, and that that claim therefore serves as an effective bar to the statute of limitations defense, we need not reach the issue of whether there was sufficient evidence for the jury to have found an express extension of the warranty.

[30] See footnote 34 of this opinion.

tive condition of the sewage treatment plant.[31] Seventh BRT argues, however, that the plaintiff cannot rely on fraudulent concealment of defects in the sewage treatment plant as a defense to the statute of limitations contained in § 47-277 because it did not specifically so plead in reply to Seventh BRT's affirmative defense.[32] Seventh BRT asserts that, although fraudulent concealment was specifically pleaded in the complaint, this court's decision in *Beckenstein* v. *Potter & Carrier, Inc.*, 191 Conn. 150, 163, 464 A.2d 18 (1983), required the plaintiff to *reassert* the claim in its reply. Id. ("[i]n order to raise a claim of fraudulent concealment, the party challenging a statute of limitations defense must affirmatively plead it"). The plaintiff argues that this claim was not preserved and, in the alternative, that an affirmative claim of fraudulent concealment is sufficient to assert that claim as a tolling mechanism for the statute of limitations. Because we agree that the claim has been waived and, therefore, is not preserved, we do not reach the plaintiff's second argument.

We ordinarily do not address issues that have not been properly raised before the trial court. *Santopietro*

---

[31] Count five of the complaint provides in relevant part:

"6. Prior to June 6, 1992, Seventh BRT possessed knowledge to the effect that the Treatment Plant was inadequate for the needs of the community and that it was not being properly operated and/or maintained.

"7. As the Condominium Declarant Seventh BRT had an obligation to disclose to the plaintiff and unit owners its knowledge regarding the inadequacies of the Treatment Plant and its deteriorating condition.

"8. Seventh BRT Fraudulently, and with an intent to mislead, concealed the information regarding the Treatment Plant from the plaintiff. . . ."

[32] We note that the plaintiff did not specifically cite the fraudulent concealment statute, General Statutes § 52-595, in count five, although it substantively alleged that Seventh BRT had fraudulently concealed information regarding the condition of the treatment plant that it had a duty to disclose.

General Statutes § 52-595 provides: "Fraudulent concealment of cause of action. If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence."

v. *New Haven*, 239 Conn. 207, 219–20, 682 A.2d 106 (1996) (court "not required to consider any claim that was not properly preserved in the trial court"); *Yale University* v. *Blumenthal*, 225 Conn. 32, 36 n.4, 621 A.2d 1304 (1993) (Supreme Court declined to address issues briefed on appeal but not raised at trial); *Burton* v. *Burton*, 189 Conn. 129, 133 n.3, 454 A.2d 1282 (1983); see also Practice Book § 4185, now Practice Book (1998 Rev.) § 60-5.[33] Furthermore, in order to preserve a claim for appeal, an exception to a jury charge must "state distinctly the matter objected to and ground of the objection." Practice Book § 315, now Practice Book (1998 Rev.) § 16-20; see *Pollack* v. *Gampel*, 163 Conn. 462, 474, 313 A.2d 73 (1972) (failure to raise point at trial by appropriate exception precludes review of claim on appeal); *Bevins* v. *Brewer*, 146 Conn. 10, 12–13, 147 A.2d 189 (1958) (ambiguous exception insufficient to preserve argument for appeal).

The record discloses the following undisputed facts. Seventh BRT interposed two exceptions to the charge on fraudulent concealment, neither of which was directed to the particular claim on appeal. The first exception was that "[the claims are] barred by [General Statutes §] 47-244 because [they relate] to individual unit owners . . . ." In the second objection, Seventh BRT stated, incorrectly, that the court had not limited the fraudulent concealment claim to the sewage treatment plant. Neither of these objections related to Seventh BRT's claim on appeal. Moreover, Seventh BRT

---

[33] Practice Book § 4185, now Practice Book (1998 Rev.) § 60-5, provides in relevant part: "The court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ." This rule of practice was repealed September 3, 1996, and replaced with Practice Book § 4061, prior to its present codification at § 60-5.

has at all times treated the claim of fraudulent conceal-
ment as a mechanism for tolling the statute of limita-
tions. In its requests for interrogatories[34] and for jury
instructions,[35] Seventh BRT made it clear that the jury
was to consider the claim in that light. Seventh BRT
was put on notice by the complaint that fraudulent
concealment was at issue, and as a result, was able
to present evidence and to cross-examine witnesses
effectively in order to refute the claim. Seventh BRT
cannot, therefore, claim either unfair surprise or preju-
dice arising from the plaintiff's assertion of fraudulent
concealment as a tolling mechanism for the statute of
limitations. Indeed, Seventh BRT acknowledged that

---

[34] Seventh BRT's requests for interrogatories relating to the fraudulent
concealment count provided as follows:

"4. Did [Seventh BRT] intentionally conceal serious problems relating to
the sewerage treatment plant from the plaintiff? . . .

"5. Has the plaintiff proven by clear, concise and convincing evidence
that [Seventh BRT's] actions were directed to the very point of obtaining a
delay in filing an action so that they could thereafter seek to take advantage
of Statute of Limitations? . . .

"6. Has the plaintiff proven that [Seventh BRT] fraudulently concealed
serious problems at the sewerage treatment plant by clear, precise and
unequivocal evidence? . . .

"6A. If the answer is yes, please state the date this first occurred. . . ."

[35] Seventh BRT's request to charge relating to the fraudulent concealment
count provides in relevant part:

"4. The warranty with respect to the sewerage treatment plant has expired.
With regard to the sewerage treatment only, the plaintiff has alleged that
[Seventh BRT] fraudulently, and with an intent to mislead, concealed the
information regarding the treatment plant from the plaintiff. To establish
that [Seventh BRT] had fraudulently concealed the existence of the cause
of action and so had tolled the Statute of Limitations, the plaintiff has the
burden of proving that the defendants were aware of the facts (serious
problems) necessary to establish this cause of action, and that this defendant
had intentionally concealed those facts from the plaintiff. . . .

"5. [Seventh BRT's] actions must have been directed at the very point of
obtaining the delay [in filing the action] of which they afterward [seek] to
take advantage of by pleading the statute. To meet this burden, it is not
sufficient for the plaintiff to prove merely that it was more likely than not
that [Seventh BRT] had concealed the cause of action. Instead, the plaintiff
has to prove fraudulent concealment by the more exacting standard of clear,
precise and unequivocal evidence. . . ." (Citation omitted.)

the court had charged the jury on the issue of fraudulent concealment substantially as it had requested. Furthermore, the trial court explicitly stated that the plaintiff was asserting that Seventh BRT had attempted to "hide what they had done earlier so as to prevent the lawsuit . . . ." Consequently, Seventh BRT has waived the argument that the fraudulent concealment claim cannot operate as a tolling mechanism.

Seventh BRT also argues that the fraudulent concealment claim cannot be both a tolling mechanism and an independent claim for relief, and that it was, therefore, inappropriate for the jury to award damages pursuant to that claim. Immediately after instructing the jury on the elements of fraudulent concealment and fraudulent misrepresentation, including the heightened burden of proof required for these counts, the court instructed the jury as follows: "With respect to damages for fraud, if you conclude that the plaintiff has sustained its burden of proof on the issue of fraud, if you conclude that [Seventh BRT] was guilty of fraudulent misrepresentations, then it will be necessary for you to determine the damages which the plaintiff is entitled to recover." Seventh BRT did not except to this charge or request that it be clarified, nor did it object to the interrogatories.

The jury determined that Seventh BRT was liable for both fraudulent concealment and fraudulent misrepresentation. Although the interrogatories for both counts provided the opportunity to award damages, the jury did so only in response to the fraudulent concealment interrogatory.[36] Seventh BRT did not object to these

---

[36] The interrogatories relating to the fraudulent concealment count were answered as follows:

"13. Did [Seventh BRT] fraudulently, and with an intent to mislead, conceal information regarding the treatment plant from the Association and the unit owners so as to obtain a delay in filing the action?

ANSWER: YES

"14. If your answer to #13 is yes, what amount of damages is attributable to that concealment?

interrogatories and, therefore, we will not review them. *West Haven Sound Development Corp.* v. *West Haven*, 207 Conn. 308, 315–17, 541 A.2d 858 (1988). The parties had agreed to allow the jury a substantial amount of flexibility in allocating damages among interrogatories and they apparently agreed that damages either could be awarded separately for each overlapping count or could be awarded just once and subsequently reconciled with the verdict forms. In response to a jury question regarding allocation of damages, the court stated that "when we see what your response is to the interrogatories and your verdict forms, there are ways for the court and counsel to work through that." Furthermore, the only claim made by Seventh BRT regarding fraudulent concealment in the memorandum in support of its motion to set aside the verdict and for judgment notwithstanding the verdict was that the damage award should have been reduced by the amount that the plaintiff had recovered from insurance pursuant to General Statutes § 47-253. Seventh BRT did not argue that it was inappropriate for the jury to have awarded damages at all. Any argument that the court improperly permitted the jury to award damages for fraudulent concealment has, therefore, been waived.

## D

### Fraudulent Misrepresentation

Seventh BRT claims that count six of the complaint, alleging fraudulent misrepresentation, should have

---

ANSWER: $95,683.00"

The interrogatories relating to fraudulent misrepresentation were answered as follows:

"15. Did [Seventh BRT] make representations to the Association and the unit owners regarding the adequacy of the treatment plant, its operation and maintenance that were untrue or with reckless disregard as to whether they were true?

ANSWER: YES

"16. If your answer to #15 is yes, what amount of damages is attributable to [Seventh BRT's] conduct?"

ANSWER: $＿＿＿＿＿＿"

been charged out of the case on statute of limitations grounds, based upon the trial court's decision to charge out counts seven and nine, alleging wilful and wanton misrepresentation and breach of duty of care, respectively, by Seventh BRT. Count six alleged that Seventh BRT had made representations regarding the condition of the sewage treatment plant "with the knowledge that they were untrue and/or with a reckless disregard as to whether they were true or untrue." That count further alleged that Seventh BRT made these representations for the purpose of inducing individuals to purchase units. Seventh BRT answered that the claim was time barred by General Statutes § 52-577, which provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

It is the responsibility of the appellant to brief each issue adequately; see Practice Book § 4064C, now Practice Book (1998 Rev.) § 67-4; and to move for an articulation in order to clarify the basis of the trial court's decisions should such clarification be necessary for effective appellate review of the issue on appeal. Practice Book § 4007, now Practice Book (1998 Rev.) § 61-10 ("[i]t is the responsibility of the appellant to provide an adequate record for review"); Practice Book § 4051, now Practice Book (1998 Rev.) § 66-5 (appellant may move for articulation of trial court decision); *Barnes* v. *Barnes*, 190 Conn. 491, 493–94, 460 A.2d 1302 (1983) (appellant is responsible for seeking articulation). Issues that have not adequately been briefed may be deemed abandoned. *Latham & Associates, Inc.* v. *William Raveis Real Estate, Inc.*, supra, 218 Conn. 300; *Gaynor* v. *Union Trust Co.*, 216 Conn. 458, 482, 582 A.2d 190 (1990).

We note initially that the propriety of the trial court's decision to charge counts seven and nine out of the case is not before this court and, therefore, we do not

address it. Seventh BRT's brief does not analyze the trial court's reasoning in its decision to charge counts seven and nine out of the case. Furthermore, Seventh BRT's argument merely asserts, in a conclusory manner, that the same statute of limitations applies to both counts six and seven,[37] and that the statutes of limitations applicable to counts seven and nine[38] contain similar language, and concludes therefrom that, if one claim is time barred, the other must be as well. This argument is wholly inadequate to explain why the application of the statute of limitations provided for in § 52-577 to count six of the complaint will lead inexorably to the conclusion that that count is time barred. We, therefore, decline to review this claim.

E

CUTPA

Count eight of the complaint alleged that Seventh BRT had engaged in unfair and deceptive trade practices in violation of CUTPA. The jury found that Seventh BRT had violated CUTPA, but awarded no separate damages on that claim.[39] On September 11, 1996, the

[37] General Statutes § 52-577 provides: "Action founded upon a tort. No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

[38] General Statutes § 52-584 provides in relevant part: "Limitation of action for injury to person or property. No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of . . . ."

[39] The interrogatories for the CUTPA claim and the answers thereto were as follows:

"19. Does the conduct of [Seventh BRT] constitute a violation of Connecticut's Unfair Trade Practices Act (§ 42-110a et seq. of the Connecticut General Statutes)?

ANSWER: YES

"20. If your answer to #19 is yes, what amount of damages is attributable to that violation?

ANSWER: $_____"

trial court issued two memoranda of decision, awarding $100,000 in punitive damages and $81,508 in attorney's fees pursuant to CUTPA. Seventh BRT claims that the court improperly awarded punitive damages and attorney's fees pursuant to CUTPA because the basis of the plaintiff's CUTPA claim was contained in count seven of the complaint, which had been charged out of the case, and because the claim was brought beyond the three year statute of limitations as set forth in § 42-110g (f).[40]

General Statutes § 42-110g (a) provides in part that "[t]he court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper." We have stated that § 42-110g "permits a recovery of actual damages, attorney's fees and punitive damages for violations of [CUTPA]." *Freeman* v. *Alamo Management Co.*, 221 Conn. 674, 680 n.6, 607 A.2d 370 (1992). The plaintiff claims that this issue was not preserved for appeal. We disagree. Counsel for Seventh BRT excepted to the CUTPA charge, albeit in somewhat general terms, stating that "I'm excepting to all charges and, specifically . . . [to the] unfair trade practice charge, in that it is still my claim with regard to all counts related to BRT, the statute of limitations has expired, so I'm excepting to that."

Seventh BRT first claims that, because the basis of the CUTPA claim was contained in count seven of the complaint and that claim was charged out by the trial court, the CUTPA claim must necessarily fail. We disagree. The CUTPA claim is contained in count eight of the complaint and incorporated by reference paragraphs one through eleven of count seven (wilful and wanton misrepresentation in relation to the sewage

---

[40] General Statutes § 42-110g (f) provides: "An action under this section may not be brought more than three years after the occurrence of a violation of this chapter."

treatment plant), which incorporated all of count six (fraudulent misrepresentation in relation to the sewage treatment plant). Count six in turn incorporated the allegations contained in count five (fraudulent conceal-ment), which in turn alleged, that Seventh BRT knew that the treatment plant was "inoperative and in sub-stantial disrepair due to, among other things, an inade-quate design, poor construction, lack of proper maintenance and improper operation."

Taking as true Seventh BRT's contention that this serial incorporation of statements in other counts of the complaint limited the CUTPA claim to the acts alleged in the counts that it has incorporated by reference, the complaint contains three possible bases for the CUTPA allegation, namely acts amounting to fraudulent con-cealment, to fraudulent misrepresentation, and to wilful and wanton misrepresentation. Because the wilful and wanton misrepresentation count was charged out of the case, the only remaining bases for the CUTPA allega-tion are acts amounting to fraudulent concealment and fraudulent misrepresentation. In addition to finding that Seventh BRT had violated CUTPA, the jury found that it had fraudulently concealed and fraudulently misrep-resented the condition of the sewage plant. In fact, the jury awarded $95,683 in damages for fraudulent con-cealment.

Moreover, the relevant interrogatory asked merely whether Seventh BRT's "conduct" violated CUTPA and did not tie the claim to any other count in the complaint. This language reasonably could be interpreted as refer-ring to *all* of Seventh BRT's conduct and not just to the acts alleged in count seven. Seventh BRT did not request an alternative CUTPA interrogatory, nor did it object to the interrogatory as it was presented to the jury. Seventh BRT cannot, therefore, challenge the interroga-tory on appeal. *West Haven Sound Development Corp.* v. *West Haven*, supra, 207 Conn. 315–17. Consequently,

we conclude that the jury could have considered acts other than those alleged in count seven in its determination that Seventh BRT had violated CUTPA.

We next consider whether the jury properly determined that Seventh BRT had violated CUTPA. The nature of Seventh BRT's argument that the claim is barred by the statute of limitations requires us to consider both whether the jury reasonably could have found evidence that Seventh BRT had violated CUTPA, and whether the statute of limitations nevertheless bars the claim. The purpose of CUTPA is to protect the public from unfair practices in the conduct of any trade or commerce, "and whether a practice is unfair depends upon the finding of a violation of an identifiable public policy." *Daddona* v. *Liberty Mobile Home Sales, Inc.*, 209 Conn. 243, 257, 550 A.2d 1061 (1988). "CUTPA, by its own terms, applies to a broad spectrum of commercial activity. The operative provision of the act, [General Statutes] § 42-110b (a), states merely that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Trade or commerce, in turn, is broadly defined as the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state. General Statutes § 42-110a (4). The entire act is remedial in character; General Statutes § 42-110b (d); *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 615 n.4, 440 A.2d 810 (1981); and must be liberally construed in favor of those whom the legislature intended to benefit. . . . *Concept Associates, Ltd.* v. *Board of Tax Review*, 229 Conn. 618, 623, 642 A.2d 1186 (1994). *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 492, 656 A.2d 1009 (1995)." (Internal quotation marks omitted.) *Fink* v. *Golenbock*, 238 Conn. 183, 212, 680 A.2d 1243 (1996).

"It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the 'cigarette rule' by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Citations omitted; internal quotation marks omitted.) *Cheshire Mortgage Service, Inc.* v. *Montes*, 223 Conn. 80, 105–106, 612 A.2d 1130 (1992). CUTPA reflects a public policy that favors remedying wrongs that may not be actionable under other bodies of law. *Associated Investment Co. Ltd. Partnership* v. *Williams Associates IV*, 230 Conn. 148, 159, 645 A.2d 505 (1994). It is, therefore, not necessary to find Seventh BRT liable for some underlying actionable wrong in order to support a CUTPA claim.

"[A] violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . Furthermore, a party need not prove an intent to deceive to prevail under CUTPA." (Citations omitted; internal quotation marks omitted.) *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, 230 Conn. 486, 522–23, 646 A.2d 1289 (1994). "Whether a practice is unfair and thus violates CUTPA is an issue of fact." *DeMotses* v. *Leonard Schwartz Nissan, Inc.*, 22 Conn. App. 464, 466, 578 A.2d 144 (1990). Although

a failure to disclose can constitute a CUTPA violation, it will do so "only if, in light of all the circumstances, there is a duty to disclose." *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, supra, 523. We conclude that such a duty existed in the present case.

The plant was subject to the express and implied warranties contained in the CIOA and, therefore, Seventh BRT had a continuing duty not to conceal information within its knowledge with the purpose of concealing a cause of action for breach of warranty pursuant to the CIOA. The plaintiff presented evidence that the plant exhibited serious problems from the time it was built until at least 1994, when the department issued a pollution abatement order. The plaintiff also introduced evidence that Seventh BRT was aware of these recurrent problems and that information concerning these issues was not properly communicated to unit owners or to the plaintiff. The court instructed the jury that, in order to find Seventh BRT liable for fraudulent concealment it had to conclude that it knew of the defects and concealed them with the express purpose of preventing the plaintiff from filing a timely action. *Bound Brook Assn.* v. *Norwalk*, 198 Conn. 660, 665, 504 A.2d 1047, cert. denied, 479 U.S. 819, 107 S. Ct. 81, 93 L. Ed. 2d 36 (1986). The jury found that Seventh BRT, having breached its duty, was liable for fraudulent concealment and awarded damages for injuries resulting from that breach. Absent clear evidence to the contrary, we assume that the jury acted in accordance with the charge. *State* v. *Negron*, 221 Conn. 315, 331, 603 A.2d 1138 (1992). In order to find Seventh BRT liable for fraudulent concealment, therefore, the jury necessarily must have found that it had acted with the direct purpose of concealing a cause of action. As we have stated, the standard under CUTPA is lower than for fraud and requires no showing of an intent to deceive. *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank,*

supra, 230 Conn. 523. The jury, therefore, reasonably could have found that Seventh BRT's acts were unfair and deceptive and, consequently, that they constituted a violation of CUTPA.

Seventh BRT argues that the CUTPA claim is barred by the three year statute of limitations contained in § 42-110g (f). The essence of this argument is that the CUTPA claim must be time barred because, it maintains, the rest of the plaintiff's claims are time barred. Seventh BRT asserts that, although fraudulent concealment can be used to toll an underlying substantive claim, it cannot be used to toll the statute of limitations for a CUTPA violation based on that claim. In *Fichera* v. *Mine Hill Corp.*, 207 Conn. 204, 209–10 n.3, 216, 541 A.2d 472 (1988), this court determined that a CUTPA claim based on a single act that had occurred more than three years prior to the commencement of the action was time barred despite the fact that the plaintiff had not discovered the injury until eleven months before the action was filed. Although the trial court had based its allowance of the CUTPA claim on a theory of continuing duty to disclose and had not reached the issue of fraudulent concealment, this court determined that there was no continuing duty and that, even if the fraudulent act was self-concealing, the statute of limitations under CUTPA would not be tolled. Id., 216. "Since CUTPA violations are defined in General Statutes § 42-110b to include 'deceptive acts or practices in the conduct of any trade or commerce,' it is evident that the legislature intended that the perpetrators of such fraudulent practices, as well as other CUTPA violators, should be permitted to avail themselves of the statute of limitations defense provided by § 42-110g (f). Despite the existence in other states of statutes of limitation applicable to unfair trade practices establishing a limitation period for bringing an action that begins after discovery of the violation, our legislature has failed to create such an option for

victims of CUTPA violations in this state." Id. Therefore, if the deceptive acts that the jury reasonably could have found form the basis of the CUTPA claim occurred more than three years prior to the commencement of the action, that claim is time barred.

*Fichera* stands for the proposition that an arguably fraudulent or deceptive act that is itself claimed to be a CUTPA violation that occurred more than three years before the filing of the action cannot, by itself, toll the statute of limitations. It does not stand for the proposition that independent fraudulent or deceptive acts taking place within that three year period that have been undertaken for the purpose of concealing actionable conduct occurring prior to the three year period cannot independently form the basis of a CUTPA violation. Evidence was presented at trial that permitted the jury to conclude that some of the deceptive acts that formed the basis of these claims occurred within the three years prior to the date that this action was brought. For example, McDonald testified that he was aware of the serious problems with the sewage treatment plant that occurred as late as 1991. Additionally, Seventh BRT sold units to individual purchasers during that three year period. Moreover, we already have stated that Seventh BRT had a continuing duty to disclose the condition of the plant. Where a defendant has withheld information that it is under a duty to disclose, such an act may constitute an unfair or deceptive practice and, therefore, violate CUTPA. See *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, supra, 230 Conn. 522–23. The jury was instructed on the elements of fraudulent concealment and fraudulent misrepresentation, and on the statute of limitations for CUTPA. Absent evidence to the contrary, we presume that the jury acted in accordance with the instructions given by the court. *State* v. *Negron*, supra, 221 Conn. 331. It is,

therefore, reasonable to conclude that the jury determined that acts giving rise to a CUTPA violation occurred within the three year statute of limitations for CUTPA and that the claim was timely.

### F

### Unity of Interest

In count ten of the complaint, the plaintiff alleges that "the defendants Little Rock Properties Corporation, f/k/a BRT Corporation, Danbury Crossroads Corporation, f/k/a BRT Development Corporation, and Seventh BRT Development Corporation (hereinafter collectively referred to as 'the BRT entities') operate under common ownership and control such that a unity of interest exists and the independence of each corporation has ceased to exist. . . . Adherence to the fiction that the BRT entities are separate entities would serve only to defeat justice and equity allowing a single economic entity to escape liability for operations conducted separately under their various names but which were for the benefit of the whole enterprise. . . . The BRT entities are therefore jointly and severally liable for the acts and/or omissions of its individual corporations as such acts and/or omissions have been described hereinbefore." The jury specifically found that a unity of interest existed among Seventh BRT, Little Rock and Danbury.[41]

Seventh BRT claims on appeal that "[t]he jury's finding that a unity of interest exists . . . is unsupported by the evidence and, thus, the trial court erred in allowing the finding to stand." We interpret this statement as a claim that the trial court improperly denied

---

[41] The interrogatory regarding unity of interest and the answer thereto stated as follows:

"21. If you find liability on the part of [Seventh BRT], do you find that a unity of interest existed between [Seventh BRT], BRT Corporation (now known as [Little Rock]) and BRT Development Corporation (now known as [Danbury]), as charged by the Court?

ANSWER: YES"

Seventh BRT's motions to set aside the verdict and for judgment notwithstanding the verdict, which were based on insufficiency of the evidence. The plaintiff argues that this claim is not preserved and, in the alternative, that there is sufficient evidence to support the jury verdict. Seventh BRT requests plain error review should we determine that the issue is not preserved. Because we agree with the plaintiff that this claim is not preserved, we do not address Seventh BRT's assertion that the evidence was insufficient to warrant the jury's finding.[42]

"As we have repeatedly reiterated, issues not properly raised before the trial court will ordinarily not be considered on appeal." *Burton* v. *Burton*, supra, 189 Conn. 133 n.3; Practice Book § 4185, now Practice Book (1998 Rev.) § 60-5; see footnote 33 of this opinion. "We have referred to the policy reasons underlying the preservation requirement on several occasions. The policy serves, in general, to eliminate the possibility that: (1) claims of error would be predicated on matters never called to the attention of the trial court and upon which it necessarily could have made no ruling in the true sense of the word; and (2) the appellee . . . would be lured into a course of conduct at the trial which it might have altered if it had any inkling that the [appellant] would . . . claim that such a course of conduct involved rulings which were erroneous and prejudicial to him. . . . *State* v. *Kurvin*, 186 Conn. 555, 564, 442

---

[42] We reject Seventh BRT's request for "plain error" review of its claim that there was insufficient evidence of unity of interest. First, "[o]nly in the most exceptional circumstances will this court consider a claim that was not raised in the trial court." *Cahill* v. *Board of Education*, 187 Conn. 94, 99, 444 A.2d 907 (1982). Second, Seventh BRT failed to request plain error review of this claim in its "initial brief to this court, but, rather, raised it for the first time in [its] reply brief. 'It is a well established principle that arguments cannot be raised for the first time in a reply brief.' *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 593 n.26, 657 A.2d 212 (1995)." *State* v. *Wilchinski*, 242 Conn. 211, 217 n.7, 700 A.2d 1 (1997).

A.2d 1327 (1982); *State* v. *Brice*, 186 Conn. 449, 457–58, 442 A.2d 906 (1982); *State* v. *Johnson*, 166 Conn. 439, 445, 352 A.2d 294 (1974); *State* v. *Taylor*, 153 Conn. 72, 86–87, 214 A.2d 362 (1965), cert. denied, 384 U.S. 921, 86 S. Ct. 1372, 16 L. Ed. 2d 442 (1966); see *Skrzypiec* v. *Noonan*, 228 Conn. 1, 13, 633 A.2d 716 (1993) (purpose of rule is to alert the trial court to claims of error while there is still an opportunity for correction)." (Internal quotation marks omitted.) *Santopietro* v. *New Haven*, supra, 239 Conn. 220 n.13.[43]

Seventh BRT did not adequately present the issue of sufficiency of the evidence at trial. A motion for a directed verdict is a prerequisite to the filing of a motion to set aside the verdict. See, e.g., *Frankovitch* v. *Burton*, 185 Conn. 14, 15 n.2, 440 A.2d 254 (1981); *Cruz* v. *Drezek*, 175 Conn. 230, 232, 397 A.2d 1335 (1978); see also Practice Book § 321, now Practice Book (1998 Rev.) § 16-37 ("a party who has moved for a directed verdict may move to have the verdict and any judgment rendered thereon set aside and have judgment rendered *in accordance with his motion for a directed verdict*" [emphasis added]). Additionally, to permit the appellant first to raise posttrial an issue that arose during the course of the trial would circumvent the policy underlying the requirement of timely preservation of issues.[44]

---

[13] We note that it is no longer generally necessary for litigants to preserve a claim both during trial *and* posttrial in a motion to set aside the verdict in order to obtain appellate review. *Santopietro* v. *New Haven*, supra, 239 Conn. 211–13. In *Santopietro*, however, we specifically reserved the question of whether, in a civil action for money damages, it would be necessary to raise the issue of sufficiency of the evidence both during the trial and in a motion to set aside the verdict. Id., 213 n.9.

[14] We recognize that a trial court has the inherent authority to set aside a verdict even where no motion to set aside the verdict has been filed. See, e.g., *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, 216 Conn. 200, 206, 579 A.2d 69 (1990); *State* v. *Avcollie*, 178 Conn. 450, 455, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980); *Belchak* v. *New York, N. H. & H. R. Co.*, 119 Conn. 630, 637, 179 A. 95 (1935). This does not mean, however, that Seventh BRT need not have raised issues arising during the trial, in a motion for a directed verdict, in order for the

Neither in its written memorandum in support of its motion for directed verdict nor during oral argument on that motion at the close of the plaintiff's case on the corporate issues, did Seventh BRT argue that the plaintiff had presented insufficient evidence that a unity of interest existed between itself, Danbury and Little Rock.[45] Seventh BRT did, however, raise the unity of interest count at trial, arguing that the court had not properly charged the jury regarding unity of interest. Seventh BRT excepted to the jury charge as follows: "With regard to the unity of interest charge, I would except insofar as my request number ten . . . and the language that is contained in my request number seventeen. . . ."[46] [W]hat Your Honor said about the doctrine

appellate tribunal to review the trial court's denial of a motion to set aside the verdict. See W. Gallagher, Post-trial Motions (1980) p. 22 ("an absolute prerequisite to the motion under Section 321 is the filing of the motion for directed verdict"). In *Avcollie*, the defendant had filed a motion for directed verdict, thus properly alerting the court to the issue. *State* v. *Avcollie*, supra, 455. In *Belchak*, the verdict was set aside because it was inconsistent, as a matter of law, with the jury's answers to interrogatories, an issue that could not have been raised during the trial. *Belchak* v. *New York, N. H. & H. R. Co.*, supra, 632–33. In *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, supra, 206, we noted the trial court's inherent authority to set a verdict aside but did not reach the issue of whether such action was proper when no motion for directed verdict had been filed.

It is important to note that, in the present case, the court denied Seventh BRT's posttrial motions and, in fact, never ruled on the sufficiency argument. We, therefore, need not decide whether Seventh BRT's claim regarding sufficiency of the evidence of unity of interest would have been reviewable had the court granted those motions.

[45] Seventh BRT moved for a directed verdict on January 4, 1996, and renewed its motion on January 17, 1996, and again on January 25, 1996. On none of these occasions did Seventh BRT argue that the plaintiff had presented insufficient evidence of unity of interest.

[46] The request to charge filed by Seventh BRT on January 22, 1996, provides in relevant part as follows:

"10. In count ten of its complaint, the plaintiff alleges that a Unity of Interest exists between [Danbury], [Little Rock] and [Seventh BRT]. The plaintiff must show that there was such a unity of interest in ownership that the independence of the corporations had in effect ceased or never begun. It is a requirement of this rule that the defendant would escape liability for an act performed and conducted for the benefit of the whole

I felt was fine, but that the application of the doctrine does not come into play where there's no showing that [the] existence of separate corporations was to commit a fraud or perpetuate a dishonest or unjust act. The rule does not apply. That's the language that Your Honor did not include regarding that charge." Seventh BRT incorporated this exception by reference into its motion to set aside the verdict and motion for judgment notwithstanding the verdict but did not elaborate further on the issue of unity of interest.[47] The only occasion cited by Seventh BRT when the issue of insufficient evidence as to the unity of interest claim was raised was the oral argument on these posttrial motions. Seventh BRT had ample opportunity to raise the issue during the course of the trial. The plaintiff and the court explicitly alerted Seventh BRT to the fact that the plaintiff had rested as to the corporate issues and Seventh BRT did, in fact, move for a directed verdict at that time. It failed, however, to raise the sufficiency issue

enterprise. In this regard, you are to consider the fact that [Seventh BRT] is still an existing corporation. *Zaist* v. *Olson*, 154 Conn. 563, 575 [227 A.2d 552] (1967). . . .

"17. There is no question that a group of individuals or one individual may establish as many separate corporations as they desire. Obviously, the useful and beneficial role of the corporate concept in the economic and business affairs of the modern day world would be destroyed if the rule of freedom from individual liability for corporate obligations did not obtain. If the plaintiff can show that there was such a unity of interest and ownership that the independence of the corporation had in effect ceased or never begun, an adherence to the fiction of separate entity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise. This rule has been applied where one corporation with a lot of assets has transferred the assets to a smaller corporation under similar control to avoid liability. However, where there is no showing that the separate existence of the separate corporations was to commit a fraud or to perpetuate a dishonest or unjust act the rule does not apply. *Zaist* v. *Olson*, 154 Conn. 563 [575, 227 A.2d 552] (1967); *Vogel* v. *New Milford*, 161 Conn. 490 [494, 290 A.2d 231 (1971)]. . . ."

[47] Little Rock and Danbury specifically raised the issue of the adequacy of the jury charge on unity of interest in their joint motion to set aside the verdict and motion for judgment notwithstanding the verdict.

until after the jury had returned a verdict against it. This is inadequate to preserve Seventh BRT's claim for appellate review.

Furthermore, because our review is limited to matters in the record, we will not address issues not decided by the trial court. Practice Book § 4185, now Practice Book (1998 Rev.) § 60-5 ("court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial"); *Crest Pontiac Cadillac, Inc.* v. *Hadley*, 239 Conn. 437, 444 n.10, 685 A.2d 670 (1996) (claims "neither addressed nor decided" by court below are not properly before appellate tribunal); *State* v. *Miller*, 186 Conn. 654, 658, 443 A.2d 906 (1982) ("[o]nly in the most exceptional circumstances will this court consider even a constitutional claim not properly raised and decided in the trial court"). The trial court did not rule on Seventh BRT's claim, made for the first time during oral argument on the posttrial motions, that the evidence was insufficient to support the jury's finding of a unity of interest. In its memorandum of decision denying the motion to set aside the verdict, the trial court did not address the sufficiency argument, but instead addressed the argument presented in Seventh BRT's written motion concerning the adequacy of the charge.[48]

It is the appellant's burden to provide an adequate record for review. Practice Book § 4061, now Practice Book (1998 Rev.) § 60-5; *Barnes* v. *Barnes*, supra, 190

---

[48] With respect to the unity of interest, the trial court's memorandum of decision provided as follows: "The defendants now claim that *Zaist* v. *Olson*, [supra, 154 Conn. 563] requires that the verdict be set aside and for judgment notwithstanding the verdict. According to the defendants, the basis of this request is that under *Zaist* . . . the plaintiff was required to prove that the existence of a separate corporation was to commit a fraud or perpetuate a dishonest or unjust act. This court's reading of *Zaist*, however, differs. In *Zaist* . . . the court set forth two rules. The first was the instrumentality and the second was its complement, the identity rule. Id., 575–76. This court charged properly under the rules set forth in *Zaist* . . . and as such, the motions with respect to this issue are denied."

Conn. 494. It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision; *Gerber & Hurley, Inc.* v. *CCC Corp.*, 36 Conn. App. 539, 543, 651 A.2d 1302 (1995); to clarify the legal basis of a ruling; *Leverty & Hurley Co.* v. *Commissioner of Transportation*, 192 Conn. 377, 379, 471 A.2d 958 (1984); or to ask the trial judge to rule on an overlooked matter. *Wolk* v. *Wolk*, 191 Conn. 328, 335 n.1, 464 A.2d 780 (1983). Seventh BRT has not moved for an articulation of the trial court's ruling regarding the unity of interest claim. We, therefore, decline to review this issue.

G

Offer of Judgment Interest

Count sixteen of the complaint alleges that Condominium Management Group, a division of Little Rock,[49] breached its contract with the plaintiff in its operation and maintenance of the sewage treatment plant and in its failure to inform the unit owners of deficiencies in the plant. The plaintiff filed a unified offer of judgment on November 15, 1994, wherein it offered to settle all of the claims against "the defendants" for $375,000. On February 1, 1996, the jury returned a verdict against Seventh BRT totaling $881,281, which was reduced by the trial court to $532,383. The jury also found against Little Rock and Danbury based upon unity of interest but awarded no separate damages as against those defendants. The jury found separately for the plaintiffs against Condominium Management Group and awarded $40,000 in damages on that claim.

On September 5, 1996, the trial court granted the plaintiff's motion for offer of judgment interest totaling

---

[49] The complaint alleges that Condominium Management Group served as property manager for Willow Springs between July 12, 1985, and December 31, 1990.

$172,527.29 pursuant to General Statutes § 52-192a.[50] This was exactly the amount requested in the plaintiff's motion for award of interest. Seventh BRT claims that the trial court improperly awarded interest against Condominium Management Group because the $40,000 verdict against it did not exceed the plaintiff's $375,000 offer of settlement. The plaintiff argues, in essence,

---

[50] General Statutes § 52-192a provides: "Offer of judgment by plaintiff. Acceptance by defendant. Computation of interest. (a) After commencement of any civil action based upon contract or seeking the recovery of money damages, whether or not other relief is sought, the plaintiff may before trial file with the clerk of the court a written 'offer of judgment' signed by him or his attorney, directed to the defendant or his attorney, offering to settle the claim underlying the action and to stipulate to a judgment for a sum certain. The plaintiff shall give notice of the offer of settlement to the defendant's attorney, or if the defendant is not represented by an attorney, to the defendant himself. Within thirty days after being notified of the filing of the 'offer of judgment' and prior to the rendering of a verdict by the jury or an award by the court, the defendant or his attorney may file with the clerk of the court a written 'acceptance of offer of judgment' agreeing to a stipulation for judgment as contained in plaintiff's 'offer of judgment'. Upon such filing, the clerk shall enter judgment immediately on the stipulation. If the 'offer of judgment' is not accepted within thirty days and prior to the rendering of a verdict by the jury or an award by the court, the 'offer of judgment' shall be considered rejected and not subject to acceptance unless refiled. Any such 'offer of judgment' and any 'acceptance of offer of judgment' shall be included by the clerk in the record of the case.

"(b) After trial the court shall examine the record to determine whether the plaintiff made an 'offer of judgment' which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain stated in his 'offer of judgment', the court shall add to the amount so recovered twelve per cent annual interest on said amount, computed from the date such offer was filed in actions commenced before October 1, 1981. In those actions commenced on or after October 1, 1981, the interest shall be computed from the date the complaint in the civil action was filed with the court if the 'offer of judgment' was filed not later than eighteen months from the filing of such complaint. If such offer was filed later than eighteen months from the date of filing of the complaint, the interest shall be computed from the date the 'offer of judgment' was filed. The court may award reasonable attorney's fees in an amount not to exceed three hundred fifty dollars, and shall render judgment accordingly. This section shall not be interpreted to abrogate the contractual rights of any party concerning the recovery of attorney's fees in accordance with the provisions of any written contract between the parties to the action."

that, because the jury found a unity of interest between Seventh BRT, Little Rock and Danbury, and because Condominium Management Group is a division of Little Rock, the award against Condominium Management Group is part of the total award against Seventh BRT. We agree with the plaintiff.[51]

The question of whether the trial court properly awarded interest pursuant to § 52-192a is one of law subject to de novo review. "Section 52-192a (b) requires a trial court to award interest to the prevailing plaintiff from the date of the filing of a complaint to the date of judgment whenever: (1) a plaintiff files a valid offer of judgment within eighteen months of the filing of the complaint in a civil complaint for money damages; (2) the defendant rejects the offer of judgment; and (3) the plaintiff ultimately recovers an amount greater than or equal to the offer of judgment." *Loomis Institute* v. *Windsor*, 234 Conn. 169, 180, 661 A.2d 1001 (1995). The purpose of § 52-192a "is to encourage pretrial settlements and, consequently, to conserve judicial resources. *Gionfriddo* v. *Avis Rent A Car System, Inc.*, 192 Conn. 301, 305, 472 A.2d 316 (1984); *Verrastro* v. *Sivertsen*, 188 Conn. 213, 223–24, 448 A.2d 1344 (1982); *Lutynski* v. *B. B. & J. Trucking, Inc.*, 31 Conn. App. 806, 811, 628 A.2d 1 (1993), aff'd, 229 Conn. 525, 642 A.2d 7 (1994). '[T]he strong public policy favoring the

---

[51] We note that it does not appear that the trial court included the $40,000 verdict against Condominium Management Group when calculating the $172,527.29 in interest awarded pursuant to § 52-192a. Furthermore, although the judgment file provides that "[t]he court . . . by Order of September 5, 1996, awarded interest of $172,527.29 as against Seventh BRT Development Corp., Little Rock Properties Corp., Danbury Crossroads Corp., and Condominium Management Group," the order itself merely grants Seventh BRT's motion, which generically refers to "the BRT corporate defendants." Neither party has challenged the trial court's computation of the interest awarded nor has either moved for an articulation as to the parties responsible for paying it. We therefore assume that the judgment correctly expresses the intention of the trial court.

pretrial resolution of disputes . . . is substantially furthered by encouraging defendants to accept reasonable offers of judgment.' . . . *Black* v. *Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 165, 681 A.2d 293 (1996). Section 52-192a encourages fair and reasonable compromise between litigants by penalizing a party that fails to accept a reasonable offer of settlement. *Edward Denike Tree Co.* v. *Butler*, 21 Conn. App. 366, 369, 573 A.2d 349 (1990). In other words, interest awarded under § 52-192a 'is solely related to a defendant's rejection of an advantageous offer to settle before trial and his subsequent waste of judicial resources.' *Paine Webber Jackson & Curtis, Inc.* v. *Winters*, 22 Conn. App. 640, 654, 579 A.2d 545, cert. denied, 216 Conn. 820, 581 A.2d 1055 (1990). Of course, the partial settlement of a case does little for the conservation of our limited judicial resources. Accordingly, the ultimate goal in a multiparty lawsuit is the fair and reasonable settlement of the case on a global basis." *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 239 Conn. 708, 742–43, 687 A.2d 506 (1997).

"There are many instances in which it would be imprudent for a plaintiff to file individual offers of judgment to multiple defendants because partial settlement may inadvertently extinguish rights against nonsettling defendants by operation of law. Annot., 92 A.L.R.2d 533 (1963). A plaintiff, as a practical matter, would not file separate offers of judgment in cases involving vicarious liability based on respondeat superior, automobile owner/operator negligence, or statutory indemnification claims unless each of those offers of judgment were for the full value of the case. Accordingly, in cases in which global settlement is the only viable alternative, permitting unified offers of judgment promotes the purpose of § 52-192a of encouraging settlements." *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, supra, 239 Conn. 746.

In *Blakeslee Arpaia Chapman, Inc.*, we stated that, while unified offers of judgment are permitted because they encourage global settlement, "each defendant will be subject to offer of judgment interest only if the ultimate judgment rendered against *that particular defendant* equals or exceeds the amount of the offer." (Emphasis in original.) Id., 743. If Condominium Management Group were an entity distinct from Little Rock, it would not, under the rule enunciated in *Blakeslee Arpaia Chapman, Inc.*, be liable for offer of judgment interest because the $40,000 judgment against it is less than the $375,000 offer of judgment. Seventh BRT apparently is arguing that this rule bars Condominium Management Group from liability for offer of judgment interest because it is a separately *named* defendant against whom the jury has awarded damages. Seventh BRT has, however, conceded that Condominium Management Group is a division of Little Rock, and has made no argument that Condominium Management Group is a separate corporate entity that would be excluded from the jury's findings with regard to unity of interest. Furthermore, Seventh BRT has implicitly conceded in its reply brief that, if the jury's finding of a unity of interest is allowed to stand, Little Rock and its subsidiary, Condominium Management Group, are chargeable with offer of judgment interest ordered by the trial court against Seventh BRT, Little Rock and Danbury. Because Condominium Management Group is a division of Little Rock, the judgment against it is necessarily subsumed in the verdict against the unified BRT corporate defendants. Condominium Management Group is therefore liable, through Little Rock, for the offer of judgment interest awarded by the trial court pursuant to § 52-192a.

## H

## Damages

The final judgment against Seventh BRT, excluding punitive damages and attorney's fees, was $532,383. Of

that amount, $156,600 was for the sewage treatment plant, $280,100 was for the chimneys, decks, roofs and vents, and $95,683 was for fraudulent concealment. The trial court denied Seventh BRT's motion for directed verdict and its posttrial motions to set aside the verdict and for judgment notwithstanding the verdict. Seventh BRT claims that there was insufficient evidence upon which to base the jury's award of damages in that there was no evidence presented as to diminution in value of the property, and in that the repair estimates were based on 1995 values and not on the cost at the time of breach. Seventh BRT also claims that it was inappropriate to allow damages for the vents because they were not claimed in the complaint and there was insufficient evidence to support the award.

In response to Seventh BRT's claims regarding diminution in value of the property and repair estimates, the plaintiff argues that, although the measure of damages is generally diminution in value, the trial court may, at its discretion, choose to use the cost of repairs as the measure of damages. We agree.

"The defendants have assigned error in the refusal of the court to set aside the verdict awarding damages to the [plaintiff] . . . . The amount of the award is a matter within the province of the trier of the facts. . . . Then too, denial by the trial court of a motion to set aside a verdict claimed to be excessive is entitled to weighty consideration. . . . Such a claim raises a question of law. The issue here is not whether this court would have awarded more or less." (Citations omitted; internal quotation marks omitted.) *Johnson* v. *Flammia*, 169 Conn. 491, 499, 363 A.2d 1048 (1975).

"To authorize a recovery of more than nominal damages, facts must exist and be shown by the evidence which affords a reasonable basis for measuring the [plaintiff's] loss. The [plaintiff has] the burden of

proving the nature and extent of the loss . . . ." (Citation omitted.) Id., 501. "Mathematical exactitude in the proof of damages is often impossible, but the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate." *Falco* v. *James Peter Associates, Inc.*, 165 Conn. 442, 445, 335 A.2d 301 (1973).

In determining the proper measure of damages for injury to land, "[t]he legal effort . . . is to compensate the landowner for the damage done." D. Dobbs, Remedies (1973) § 5.1, p. 311. This is essentially true whether the injury is redressed under a theory of tort or breach of contract. Id. "The basic measure of damages for injury to real property is the resultant diminution in its value. *Blakeman* v. *Tobin*, 177 Conn. 597, 598, 419 A.2d 336 (1979); *Falco* v. *James Peter Associates, Inc.*, [supra, 165 Conn. 446]. There is, however, a well established exception to this formula; such diminution in value may be determined by the cost of repairing the damage, provided, of course, that that cost does not exceed the former value of the property and provided also that the repairs do not enhance the value of the property over what it was before it was damaged. *Whitman Hotel [Corp.]* v. *Elliot & Watrous Engineering Co.*, 137 Conn. 562, 573, 79 A.2d 591 (1951) . . . ." (Internal quotation marks omitted.) *Ferri* v. *Pyramid Construction Co.*, 186 Conn. 682, 689, 443 A.2d 478 (1982).

"The permissive language of *Whitman Hotel [Corp.]* clearly leaves the selection of the repair measure in the trial court's discretion, limited only by the two attached provisos . . . ." Id.[52] The cost of repairs, therefore, is

---

[52] The trial court instructed the jury that the measure of damages is "diminution in the value of the plaintiff's property caused by the defendant's injury to it. It is, however, well established that such diminution in value may be determined by the cost of repairing the damage, provided, of course, that that cost does not exceed the former value of the property and provided

a proxy for diminution in value caused by damage to property.[53] Because these are, in effect, alternative measures of damages, the plaintiff need not introduce evidence of both diminution in value and cost of repairs.

The plaintiff in the present case introduced evidence of the cost of repairs for the chimneys, decks and vents.[54] Although it would have been proper, in light of the value enhancement limitation articulated in *Whitman Hotel Corp.*, for the trial court to have refused to allow the jury "to consider as a measure of diminution in value the plaintiff's proffered evidence of repair costs in excess of the purchase price of the property being repaired"; *Johnson* v. *Healy*, 183 Conn. 514, 516, 440 A.2d 765 (1981); this is not the situation in the case before us. There is no indication that the cost of repairing the chimneys, decks and vents would exceed the purchase price of the property being repaired.

We also disagree with Seventh BRT's argument that evidence of cost of repairs must be valued at the time of the breach.[55] In *Whitman Hotel Corp.*, we rejected the argument that permitting recovery for the *actual cost* of repairs puts the plaintiff "in a better position than it was in before the damage was done." *Whitman Hotel Corp.* v. *Elliot & Watrous Engineering Co.*, supra, 137 Conn. 573. As we have stated, the cost of repairs

---

also that the repairs do not enhance the value of the property over what it was before it was damaged."

[53] We note that although there are differences in remedies available for damage to land under tort and contract theory; *Johnson* v. *Flammia*, supra, 169 Conn. 499 (recovery in tort allows total damages to exceed reasonable market value of property); cost of repairs is admissible as evidence of diminution in value of the property in both tort and breach of contract actions. See *Scribner* v. *O'Brien, Inc.*, 169 Conn. 389, 405, 363 A.2d 160 (1975).

[54] Because the plaintiff failed to introduce sufficient evidence of the cost of repairing the roofs, the trial court reduced the jury's $348,998 verdict on that claim to $100 in nominal damages.

[55] This issue was raised but not decided in *Scribner* v. *O'Brien*, 169 Conn. 389, 363 A.2d 160 (1975).

is evidence of the diminution in value resulting from Seventh BRT's actionable conduct. "[E]xpenditure for repairs would restore the building of the plaintiff to its condition of usefulness prior to the [damage] . . . ." (Internal quotation marks omitted.) Id. The jury heard, and was entitled to credit, evidence indicating that repairs undertaken by the plaintiff in the present case were necessary to restore the units at Willow Springs to the condition they would have been in had they been constructed as warranted and as required by the applicable governing regulations. The plaintiff presented evidence that the chimneys, decks and vents were in a dangerous condition because of design and construction defects, and that the repairs were, at least in part, undertaken to prevent personal injury. The plaintiff also presented testimony that the repairs undertaken were necessary for the damaged elements to conform to acceptable construction standards and to building and fire codes. The jury was, therefore, entitled to conclude that the repairs did not result in improvements to the property, in the sense that the repaired elements were of a different and superior type than they would have been had they been constructed as warranted.

It is true that damages for breach of contract are to be measured "as of the date of the breach." *Levesque* v. *D & M Builders, Inc.*, 170 Conn. 177, 181, 365 A.2d 1216 (1976); *Scribner* v. *O'Brien, Inc.*, 169 Conn. 389, 405, 363 A.2d 160 (1975). This does not necessarily mean, however, that current cost of repair estimates cannot be evidence of the extent of earlier damage.[56]

---

[56] In *Levesque*, we rejected the defendant's argument that the plaintiff had suffered no loss under the diminution in value measure of damages for injury to real property because the value of the damaged property had increased from the date of the breach to the time of trial. We stated that the proper frame of reference for diminution in value was the value before and immediately after the breach. *Levesque* v. *D & M Builders, Inc.*, supra, 170 Conn. 181. To have held otherwise would have immunized the defendant

In *Calderwood* v. *Bender*, 189 Conn. 580, 583, 457 A.2d
313 (1983), for example, we stated that the actual cost
of repairing a faulty septic system was the proper
measure of damages. It is particularly appropriate to
permit the plaintiff to use the actual cost of repairs as
evidence of damages where, as in the present case, the
jury found that Seventh BRT had fraudulently concealed
the condition of the plant, that it had knowingly and
purposefully and with reckless disregard for the truth
misrepresented the condition of the plant, and that the
cause of action for those of the chimneys, decks and
vents for which it was permitted to award damages had
not even accrued until within three years of the filing
of the action. See also *Levesque* v. *D & M Builders*,
*Inc.*, supra, 182 ("the cost of remedying the defect is
admissible in proving the difference in value between
the house as built and as specified in the agreement").
Moreover, Seventh BRT has not claimed that the
plaintiff unreasonably delayed making repairs, thereby
increasing their cost. We therefore conclude that it was
reasonable for the jury to base its verdict on current
repair costs.

We turn finally, with a weary and somewhat
jaundiced eye, to Seventh BRT's claim that the trial
court improperly allowed the jury to award damages
for the dryer vents because they were not claimed in
the complaint and because there was insufficient
evidence to support the award. The plaintiff argues that
the allegations regarding the vents were added pursuant
to a timely motion to amend the complaint and that the
repair estimates presented to the jury provided a proper
basis for the damage award. We agree with the plaintiff.

"Modern procedure has come a long way from the
day when slight variances were fatal to a cause of action.

---

from liability for its actions merely because of the time that had elapsed
between the breach and the trial. Id., 182–83. The same considerations do
not apply to using repair costs as evidence of diminution in value.

This is reflected in our rule of practice as a code state that immaterial variances shall be wholly disregarded. Practice Book § 134 [now Practice Book (1998 Rev.) § 10-22]. It is said we have an established liberal practice in regard to immaterial deviations from the allegations of the complaint. *Pierce, Butler & Pierce Mfg. Corporation* v. *Enders*, 118 Conn. 610, 613, 174 A. 169 [1934]. A variance in the factual aspect of a case which does not prejudice the opponent, and which does not change the theory of the cause of action, should not under ordinary circumstances be allowed to make voidable an otherwise sound judgment. See *Antonofsky* v. *Goldberg*, 144 Conn. 594, 599, 136 A.2d 338 [1957]; *Reciprocal Exchange* v. *Altherm, Inc.*, 142 Conn. 545, 551, 115 A.2d 460 [1955]; *Taylor* v. *Corkey*, 142 Conn. 150, 153, 111 A.2d 925 [1955]; *Klein* v. *DeRosa*, 137 Conn. 586, 591, 79 A.2d 773 [1951]; *Frosch* v. *Sears, Roebuck & Co.*, 124 Conn. 300, 303, 199 A. 646 [1938]. Of course, a variance which alters the basic nature of a complainant's cause of action cannot be condoned. In other words, [a] plaintiff may not allege one cause of action and recover upon another. *Malone* v. *Steinberg*, 138 Conn. 718, 721, 89 A.2d 213 [1952]; *Levy* v. *Carter Rice & Co.*, 136 Conn. 216, 221, 70 A.2d 147 [1949]." (Internal quotation marks omitted.) *Schaller* v. *Roadside Inn, Inc.*, 154 Conn. 61, 64–65, 221 A.2d 263 (1966).

We agree with Seventh BRT that the complaint did not explicitly name the vents as an element for which damages were sought. The original complaint included only claims relating to the sewage treatment plant and did not make any allegations regarding damage or breach of warranty as to the residential buildings. A motion for leave to amend was filed on November 19, 1990, pursuant to which the plaintiff added claims relating to the residential structures.[57] That complaint,

---

[57] The trial court permitted the jury to award damages for only forty-six dryer vents. These vents are contained in the units sold to BRT Property

after specifically alleging breach of warranty relating to the sewage treatment plant, alleged that Seventh BRT had "breached the implied warranty of quality contained in § 47-275 . . . by failing to design and construct the condominium free from defective materials, in accordance with applicable law, according to sound engineering and construction standards and in a workmanlike manner. Such failures include, but may not be limited to, the following . . . failing to install fire-resistant materials in certain basement areas . . . failing to construct structurally sound chimneys on several of the units . . . ." This language put Seventh BRT on notice that the plaintiff would claim damages relating to defects in the residential buildings. The claims relating to the vents did not rest on a different legal theory than the other allegations in count two of the complaint, all of which concerned construction defects in the condominiums.

The evidence indicates that Seventh BRT was on notice that evidence regarding defects in the vents would be presented at trial. The trial court explicitly announced to the jury that evidence would be presented regarding the vents and reminded the jury that this was "issue number five," which indicates that the court, the parties and the jury were aware that evidence would be presented regarding this claim. Significantly, Seventh BRT has not argued that it was surprised or unfairly prejudiced by the plaintiff's presentation of evidence regarding the dryer vents. We, therefore, conclude that

Group in 1987 and then sold to individual purchasers and in the units retained by Seventh BRT that were sold to individual purchasers during the three years next preceding the filing of this action. The plaintiff introduced into evidence deeds showing that these units were all sold after the request to amend the complaint was filed. Because we are satisfied that Seventh BRT was properly notified by the amended complaint that the plaintiff would seek damages for the vents, we conclude that these claims were not barred by the statute of limitations.

the court properly allowed the jury to award damages for the vents.

Seventh BRT argues that the plaintiff presented insufficient evidence of damage to the vents because it introduced into evidence only two repair bills—one for $836.26, and another for $2977.34—to repair a vent, and those repair bills were for units other than the ones for which the trial court allowed the jury to award damages.[58] We disagree.

The plaintiff has the burden of proving the extent of the damages suffered. *Johnson* v. *Flammia*, supra, 169 Conn. 501. Although the plaintiff need not provide such proof with "[m]athematical exactitude . . . the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate." *Falco* v. *James Peter Associates, Inc.*, supra, 165 Conn. 445. As we have stated previously, the determination of damages is a matter for the trier of fact and the "denial by the trial court of a motion to set aside a verdict claimed to be excessive is entitled to weighty consideration." (Internal quotation marks omitted.) *Johnson* v. *Flammia*, supra, 499. It is, therefore, unnecessary for the plaintiff to show precisely what the cost of repair would be if it has presented sufficient evidence from which the jury reasonably can derive the damages incurred.

In the present case, the parties stipulated to the number of vents for which the jury was allowed to award damages. The plaintiff introduced into evidence the deeds for the units containing these vents. The plaintiff's witnesses described which types of units had defective vents and what had to be done to repair them. There was testimonial and photographic evidence showing the structure of the Willow Springs complex as a whole and showing the layout of the residential

---

[58] The jury awarded $79,000 in damages for the dryer vents.

buildings. In addition to the two repair bills mentioned previously, both of which detailed the number of hours required to repair the vents in question, the plaintiff also introduced evidence that it had hired a handyman, who was paid $17 per hour, to repair the vents.[59] This is lower than the $28 per hour labor charge contained in the repair bills. We conclude, therefore, that the plaintiff presented sufficient evidence from which the jury reasonably could have estimated damages relating to the vents and that the verdict was within the parameters of the proof presented.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[59] We note that the verdict falls in between the amounts that would result had the jury simply multiplied either the lower or the higher repair bill by the number of vents.