[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action is a suit alleging breaches of the implied warranties present in the sale of newly constructed homes pursuant to General Statutes § 47-116, 47-118 and Unfair Trade Practices as per § 42-110a et seq. In addition to the above-named defendants, the suit, as originally brought also named Carl Zimmitti and David B. Greenberg as defendants. On July 23, 1996, however, withdrawals of action were filed as to Zimmitti and Greenberg. Further, after the plaintiffs rested, the court granted Bernard Barnett's motion for a dismissal of the suit against him individually because the plaintiffs had failed to produce a prima facie case. Practice Book § 15-8.
 I
With respect to the plaintiff's suit against The Fieldbrook Corporation (hereinafter the defendant), the court finds that the facts set forth below were proven.
On January 28, 1992, a written contract was executed providing for the sale to the plaintiffs of the house constructed by the defendant on lot 3, Cromwell Heights subdivision in the town of North Haven. The purchase price was $290,000.00 and, in addition to the real estate, included window screens, range, dishwasher, disposal, microwave, two automatic garage door openers and controls. In paragraph 5 of the contract, the defendant was obligated to reseed the lawn where necessary in the spring and to correct the front steps and down spouts. CT Page 8076
According to paragraph 8 of the contract entitled "Physical Inspection Contingency" the plaintiffs had a 10 day period after the contract was signed to inspect the premises and thereafter a one day period in which to notify the defendant of the results of the inspection. Coupled with the "Physical Inspection Contingency" is the language of paragraph C printed on the reverse side of the contract wherein it is stated that the "buyer" is satisfied with the condition of the premises subject to paragraph 8 and a final inspection during a 48 hour period prior to the closing. In paragraph C, the plaintiffs as the "buyer" also agreed that the defendant had not made any representations other than those expressly set forth in the contract.
Pursuant to the contract, the plaintiff inspected the house on a Sunday morning accompanied by a builder, a plumber and an electrician. The builder spoke with Carl Zimmitti who at the time, was an officer, director and shareholder of the defendant. The inspection resulted in the delivery to the defendant of a "list of items which need attention lot 3 Cromwell Road" The following items appear on the list "1. Coating of paint on outside of house — paint thin particularly in back of house; 2. In basement 1.5 inch drain pipe — overflow drain pipe needs to be connected to sewer line; 3. Front Bedroom — flaw in wall around light switch and plug below; 4. Front entrance — bases of light fixtures cracked (outside lights); 5. Front entrance — above right front door light — sheeting doesn't come together; 7. Does a mail box stand come with the house? 8. Outside of house — oil filler cap is too close to side; 9. Garage doors — insulation not complete in area surrounding garage doors; 10. Wood on left of right garage door seems to be old; 11. Master bedroom — bathroom doors need to be replaced it is burned; 12. Attic windows — two front windows have a space poorly fitted; 13. Master bathroom access space for pump doesn't seem to be large enough for repair work to be done; 14. Master bedroom — holes in plaster above door from master bedroom to unfinished room; 15. Master bathroom — holes behind toilet by shut-off valve; 16. Guest bathroom — shower curtain rod is needed — also space around tub and floor should be grouted; 17. Master bathroom — damaged wall near towel rack; 18. Grass seed mixture for spring feeding: (must be done no later than first week in April) mixture must be in the following percentages: (Manhattan perennial rye — 50%; Fescue — 25%; Kentucky Blue — 25%); 19. Radiator end pieces missing in some areas."
The exterior of the house was stained not painted with one CT Page 8077 coat and two coats on the trim. Before the closing. The plaintiffs had asked Carl Zimmitti about additional stain and were informed that the defendant was obligated for only one coat. Unless a purchaser offered to pay for more than one coat of paint or stain, the rule among area developers in 1992 was that only one coat would be provided.
Except for the grass seed for which the parties later split the cost, the items on the plaintiff's list were taken care of apparently to their satisfaction since the closing occurred on March 31, 1992. The plaintiffs moved into the house immediately after the closing and have occupied it continuously as their residence.
The plaintiffs testified that defects started to appear within six month after the commencement of their occupancy. On March 23, 1993, their former attorney sent a letter to the defendant listing the defects that were discovered within one year after the closing date. Some items in the attorney's letter appear to be the same items that were on the plaintiff's pre-closing list. Bernard Barnett testified that all items on this list had been corrected before or shortly after the closing. In general, however, witnesses, expert and otherwise, for both sides were not questioned on the basis of the pre-closing list or the attorney's letter. Rather the witnesses were questioned on the presence or absence of the conditions alleged in paragraph 13(a) through (q) of the first count in the complaint.
As phrased in paragraph 13, the conditions upon which breaches of implied warranties have been claimed were:
(a) an insufficient amount of stain was applied to the exterior of the home such that certain portions of the exterior appear never to have been stained;
(b) paint of an inferior quality was applied to the window shutters, and/or paint was applied in an un-workman-like manner such that the paint peeled off the shutters;
(c) no curtain drains were installed, causing excessive surface water draining from the adjoining premises to collect on the plaintiff's property, which has caused a retaining wall to tip;
(d) open spaces remained surrounding the frames of the two CT Page 8078 dormer windows and two end windows located in the attic, through which spaces snow and rain entered, causing leaks and stains in the ceilings below, and through which a large number of flies has entered the attic during the summer months;
(e) a leak from the attic has damaged the ceiling in the living room and in the second floor northeast bedroom;
(f) open spaces remained in two of the corners of the attic where the roof rafters meet the floor joists;
(g) an open saw cut remained through the attic's exterior wall;
(h) the exterior trimboard located at the beginning of the gutter in the rear of the garage cracked and split;
(i) the trimboard surrounding both garage doors split and pulled away from the house;
(j) various clapboards buckled due to poor installation;
(k) portions of the front door trim split;
(l) a decorative shrub in the front of house did not thrive;[1]
(m) the basement door was improperly installed;
(n) grouting was not applied sufficiently to the upstairs shower tub;
(o) grouting of the master bath Jacuzzi cracked, and was not properly sealed;
(p) the Formica splashboard located in the master bathroom bowed and split from the wall;
(q) the down spouts lacked splash pans.
On April 6, 1995, the plaintiffs hired M M contractors to stain the exterior of the house with two coats, paint the exterior of the windows, the trim on the house and all exterior doors including garage doors, stain the deck and re-nail or replace clapboards where necessary. M M's quoted price was CT Page 8079 $5,700.00 plus an additional $1500.00 should a third coat of stain be applied to the exterior of the house. The plaintiffs replaced the original dark grey stain on the house with a lighter color. M M Contractors applied three coats of stain to the house and two coats of paint to the shutters. The plaintiffs paid $7,200.00. Although the amount of money paid to M M contractors was the same as the estimate, there was no breakdown of price for the different categories of work. The plaintiffs testified that10-15 clapboards on a side of the house had buckled. Two of the clapboards were improperly installed and the front door trim had split at the seams.
Norman Babbitt, the plaintiff's expert witness was in the house as a social guest within three weeks after the plaintiff moved in. He also was there between April 6, 1995 the date of the M M estimate and November 30, 1996 when, at the request of the plaintiffs, he inspected the premises and submitted his own estimates of cost to repair and/or replace. Applying Mr. Babbitts's figures to the aforesaid allegations of paragraph 13 yields the following results: (a) (b) $4,500.00, for one coat of stain (c) $5,000.00, (d) $5,00.00, (e) $1,000.00, (f) $50.00, (g) $300.00, (h) $100.00, (i) $200.00, (j) $300.00, (k) $100.00, (l) $100.00, (m) $25.00, (n) $50.00, (o) $100.00, (p) $50.00, (q) $25.00. The total of Mr. Babbitt's estimates is $12,400.00.[2]
John Matson who examined the plaintiffs' premises in 1997 testified as an expert witness for the defendant. Much of his testimony was contradictory to that of Mr. Babbitt. For example, Babbitt said that in the area of the leaks, he observed an open saw cut that went through the rafters and the outside clapboards. Matson, on the other hand, attributed the leaks to water accumulating on and under the plastic covering that the plaintiffs had placed on the floor of the attic. Babbitt was of the opinion that curtain drains should be installed on the plaintiffs' property. Matson felt that curtain drains were unnecessary.
In fact, conflicts pervaded the entire case — not only as to the apparentness of the defects but also as to their very existence. This situation required some additional findings of fact that appear in the next sections of this memorandum.
 II
The term "improvement", as defined in the New Homes CT Page 8080 Warranties Act (sec 47-116; et seq.) includes inter alia a newly constructed single family dwelling unit and any fixture or structure which is made a part thereof at the time of construction. In Krawiec v. Blake Manor Development Corporation,26 Conn. App. 601, 606 (1992). the concept of a newly constructed single family dwelling unit was enlarged to encompass both the house and the lot upon which it stands so that both house and lot qualify for the implied warranties, of § 47-118.
Section 47-118 (a) provides that, unless the exceptions of subsections (b) and (c) apply, there are four implied warranties in a sale of any newly constructed single family dwelling and/or its lot, namely: (1) free from faulty materials; (2) constructed according to sound engineering standards; (3) constructed in a workman-like manner and (4) fit for habitation when the deed is delivered or at the time of completion if a particular improvement is not completed at the delivery of the deed. Implied warranties, succeeding or modifying caveat emptor, have become necessary according to the Supreme Courts of Illinois and Missouri because of the changes in the construction and marketing of new homes.
 Many new houses, in a sense, are now mass produced. The vendee has little or no opportunity to inspect. The vendee is making a major investment, in many instances the largest single investment of his life. He is usually not knowledgeable in construction practices and, to a substantial degree, must rely upon the integrity and skill of the builder-vendor, who is in the business of building and selling houses.
Petersen v. Hubschman Construction Co. Inc., 389 N.E.2d 1154,1158 (Ill. 1979).
 The structural quality of house, by its very nature, is nearly impossible to determine by inspection after the house is built, since many of the most important elements of its construction are hidden from view. The ordinary consumer can determine little about the soundness of the construction but must rely upon the fact that the vendor-builder holds the structure out to the public as fit for use as a residence and of being of reasonable quality.
Smith v. Old Warson Development Company, 479 S.W.2d 795, 799 (Mo. en banc 1972). The Illinois and Missouri decisions are cited with approval in Mitchell v. Madison Enterprises, CV 9057188S (Tolland CT Page 8081 J. D. 1997).
Noted earlier were the two exceptions to the implied warranties of § 47-118 (a). The exception in § 47-118 (d) (circumstances when an implied warranty may be excluded or modified by written instrument) in the court's opinion, is inapplicable. But the exception in § 47-118 (b) (implied warranties do not apply to conditions that would be revealed to a reasonably diligent person by an inspection) is very much at issue. Generally, implied warranties are designed to protect buyers against latent defects. Petersen v. Hubschman ConstructionCo., Inc., supra, 389 N.E.2d 1157; see Krawiec v. Blake ManorDevelopment Corporation, supra, 26 Conn. App. 606. The plaintiffs here made an inspection prior to purchase in the company of people skilled in building, plumbing and electrical work. These inspectors pointed out many defects which are the subjects of this law suit. Because of § 47-118 (b), the dispute concerning the quality of the stain used on the house and/or its application must be resolved in favor of the defendant. Not only was the stain a condition that was open, obvious and noticed prior to purchase, the plaintiffs were specifically informed before the closing that no additional stain would be forthcoming.
The different conclusion has been reached regarding the absence of curtain drains in the plaintiffs' property. Mr. Babbitt's testimony was that the grades on the plaintiffs' lot were such that curtain drains were required. And whereas Mr. Matson expressed a contrary view, it is the court's prerogative to determine which expert witness offered more credible and probative evidence. Feigenbaum v. Waterbury 20. Conn. App. 148, 152 (1989). Morever, the absence of curtain drains qualifies a latent defect because a developer-builder is in a much better position to know the soil and water conditions than a purchaser of one house and lot in a subdivision. Krawiec v. Blake ManorDevelopment corporation, supra, 26 Conn. App. 606.
The remaining items listed in paragraph 13 of the complaint require a resolution of a conundrum. These items, or most of them, were included as defects in the list prepared after the plaintiffs in the company of a builder, plumber and electrician. At first glance it would appear that for these defects, the exception of § 47-118 (b) is applicable. Bernard Barnett, the defendant's president testified, however, that the listed defects, except for the stain, had been corrected either prior to the closing or shortly after. Yet the defects were observed by CT Page 8082 the plaintiffs within one year of the closing date of March 31, 1992 and by Mr. Babbitt in a time period between April 6, 1995 and November 30, 1996. From the evidence submitted by both parties, the court concludes that the appearance, or in many instances the reappearance, of the defects means that the corrections that the defendant claimed to have made were not performed with the requisite standard of care. The defendant was under a duty to exercise that degree of care which a skilled builder of ordinary prudence would have exercised under the same or similar conditions. Coburn v. Lenox Homes, Inc. 186 Conn. 370,381 (1982).
Mr. Babbitt was the only witness who supplied evidence of the cost of repairs. Based on his testimony and written estimates, the cost to repair the allowed items is $7,800.00.
 III
The test used in determining whether a defendant's actions constitute and unfair or deceptive trade practice is the three part criteria adopted by the Federal Trade Commission and known as the "cigarette rule." McLaughlin Ford, Inc. v. Ford Motor Co.,192 Conn. 558, 567-68 (1984). The three criteria are "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law or otherwise — in other words, it is within at least the penumbra of some common law, statutory or other established concept of unfairness; whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers (competitors or other businessman)." Cheshire Mortgage Service, Inc. v. Montes,223 Conn. 80, 106 (1992). It is important to remember, however, that all three criterial do not need to be satisfied in order to support a finding of unfairness. "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Willow SpringsCondominium Assn., Inc. v. Seventh BRT Development Corp.,245 Conn. 1, 43 (1998).
Whether a practice is unfair and thus a violation of the Unfair Trade Practices Act (CUTPA) is a question of fact. Krawiecv. Blake Manor Development Corporation, supra, 26 Conn. App. 607. In Krawiec, the Appellate Court upheld a trial judge's finding that a defendant's violation of the implied warranties in §47-118 constituted an unfair trade practice. In Willow SpringsCT Page 8083Condominium Association, Inc. v. Seventh BRT Development Corp.,supra, 245 Conn. 43-45, the Supreme Court likewise sustained a jury's verdict that a defendant's violation of the implied warranties contained in the Common Interest Ownership Act (sec47-275) also was an unfair trade practice proscribed by CUTPA. Both CUTPA and the Implied Warranties statutes were enacted to protect the public. Daddona v. Liberty Mobile Home Sales, Inc.,290 Conn. 243, 257 (1988); Petersen v. Hubschman ConstructionCo., Inc., supra, 289 N.E.2d 1159. In reliance upon Krawiec v.Blake Manor Development Corporation and Willow Springs CondominiumAssociation, Inc. v. Seventh BRT Development Corp., the court has no hesitancy in holding that the defendant's breach of the implied warranties imposed by § 47-118 was also an unfair trade practice.
 IV
The findings of a CUTPA violation permits of course an award of punitive damages, General Statutes § 42-110g (a) plus the fee of the expert witness and a reasonable attorney's fee. General Statute § 42-110g (d).
The effect of the implied warranties is that they become part of the contract between the parties.[3] Where a contract is breached, the general rule is that the injured parties should be placed in the same position that they would have been in had the contract been performed. Beckman v. Jalich Homes, Inc.,190 Conn. 299, 309 (19830. Compensatory damages are assessed at $7,800.00 and punitive damages in the amount of $2,000.00 are awarded. The plaintiffs' attorney has filed two affidavits, exhibits F and K pertaining to her services and the plaintiff's expert witness has filed a statement detailing his fees and expenses, exhibit J.
If the defendant's counsel opposes the sums requested for the fees and costs of the plaintiff's attorney and expert witness, he shall notify the court and request a hearing within ten days of the date of this memorandum. Otherwise the amounts[4] requested will be incorporated in the judgment.
Barnett, J.