[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action was brought by the plaintiff Richard Votto to recover damages as a result of unauthorized charges to his credit card (Visa) by the defendant American Car Rental, Inc. doing business as Acme Rent-A-Car and to recover attorneys fees and punitive damages for violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes §42-110b et seq.
On February 20, 2001, the plaintiff rented a truck from the defendant and executed a one-page agreement preprinted on both sides (agreement) which was prepared by the defendant. The front side of the agreement was entitled "Rental Agreement" and had blank spaces to be completed in order to indicate the renter's name, address, type and identification of the vehicle being rented and other such matters.
Also, included on the front page of the agreement was a paragraph entitled "Vehicle Damage Waiver" (waiver). The plaintiff was advised by an employee of the defendant that this waiver provided coverage in order to release him of any responsibility if the truck was damaged as a result of a collision. The preprinted waiver read as follows: "Rates: $13.95 per day, $97.65 per week. By initializing a box, renter accepts or declines vehicle damage waiver for rates listed above and for damage option below. By accepting waiver, renter accepts full responsibility for all loss/damage to the rented vehicle up to/over (circle one) $0 amount per occurrence regardless of cause. Notice: waiver does not cover loss or damage resulting from any violation of paragraphs 1 or 2 of this agreement, for missing vehicle parts or interior vehicle damage other than normal wear and tear caused by occupants. By declining waiver, customer accepts full responsibility for all loss/damage to rental vehicle." The underscored monetary amounts were completed by the employee of the defendant at the time of the rental. The agreement required the renter to initial his acceptance or rejection of the waiver. The plaintiff accepted and agreed to pay to the defendant $13.95 per day for the waiver. CT Page 3070
The plaintiff signed the front of the agreement and above his name there was preprinted the following: "Renter has read both sides of this agreement and agrees to the terms and conditions thereof."
The reverse side of the agreement had approximately 144 lines of print in two columns containing approximately 1775 words printed in type which was a little less than one-sixteenth of an inch. The agreement is very difficult to read. Unlike the waiver there was no requirement that the renter initial any section of the reverse side of the agreement.
The pertinent part of the agreement on the reverse side as it pertains to the waiver which was included in paragraph 2 was as follows: "The vehicle shall not be used . . . 12) to drive in or through a structure where there is insufficient clearance, whether of height or width."[1]
On February 22, 2001, the day he rented the vehicle, the plaintiff struck a low railroad overpass and damaged the truck.[2] He reported the collision to the police and returned the truck to the defendant assuming the damage was covered by the waiver. The court finds that this belief of the plaintiff was reasonable based on the wording of the waiver that he initialed and what he was told by the employee of the defendant. The reasonableness of his belief is underscored when the annualized cost of the waiver in the amount of $5077.80 ($97.65 x 52 weeks) is considered. However a literal reading of the waiver clause together with paragraph 2 on the reverse side of the agreement would preclude such coverage.
On the same day of the collision, the defendant charged the plaintiff's credit card (Visa) the following amounts: $115.00,[3] $345.00, $285.00, $3,450.00 and $5,750.00, totaling $12,535.00. The defendant failed to advise the plaintiff of the charges. When these charges came to the attention of the plaintiff on March 27, 2001 he protested them to Visa and except for the $115.00 charges, they were removed. Visa subsequently reinstated the following charges: $345.00, $2,875.00, and $3,450.00, totaling $6,670.00.
The agreement in this case is a classic example of a contract of adhesion.[4] "The concept that a contract of adhesion should be interpreted and enforced differently from an ordinary contract has evolved from cases which have involved contractual provisions drafted and imposed by a party enjoying superior bargaining strength — provisions which unexpectedly and often unconscionably limit the obligations and liability of the party drafting the contract." (Internal citation omitted) Madden v. Kaison Foundation Hospital, 552 P.2d 1178, CT Page 3071 1185 (1976).
The terms of the agreement were not subject to negotiation and the waiver was presented on an accept or decline basis. It is an understatement to characterize that the print on the agreement, and in particular the reverse side, is difficult to read. Unlike the waiver clause there was no requirement that the renter initial his acceptance or rejection of any section on the reverse side of the agreement. Although the waiver provides that it "does not cover loss or damages resulting from any violation of paragraph 1 or 2 of this agreement" it makes no reference that those paragraphs can be found on to the reverse side of the agreement. The wording of the waiver, without reading paragraphs 1 and 2 on the reverse side, would lead a person to believe that all losses would be covered when it contained the following language "-0- amount per occurrence regardless of the cause," (emphasis supplied). Indeed, if the plaintiff was a professor of law he could not be expected to be aware of these inconspicuous parts of the agreement upon which the defendant relies.
Like the insurance contract in Aetna Casualty Surety Co. v.Murphy, 206 Conn. 405, 416 (1988), "[t]here can be no question that the . . . agreement in this case is a `contract of adhesion.' That term was first introduced into American legal vocabulary by Professor Edwin Patterson, who noted that life insurance contracts are contracts of adhesion because [t]he contract is drawn up by the insurer and the insured, who merely `adheres' to it, has little choice as to its terms. Standardized contracts of insurance continue to be prime examples of contracts of adhesion, whose most salient feature is that they are not subject to the normal bargaining processes of ordinary contracts. The fact that the notice provisions in the . . . insurance policy were an inconspicuous part of a printed form supports the characterization of these clauses as a `contract of adhesion.' Nothing in the records suggests that they were brought to . . . [the defendant's] attention or that, if they had been, their terms would have been subject to negotiation." (Citations and internal quotation marks in part omitted).
Accordingly, to limit the waiver, because of a prohibition on the reverse side and thereby nullify the protection that the plaintiff had assumed he purchased when he made the election would, in the words of the Supreme Court of Connecticut, be "revolting to the moral sense and contrary alike to the salutary principles of law and sound public policy." (Citation and internal quotation marks omitted). Malone v.Santora, 135 Conn. 286, 293 (1949) (In Malone, a bailee attempted to limit his liability for negligence by having printed on a claim check given to the car owner the following: "Liability. Management assumes no CT Page 3072 responsibility of any kind. Charges are for Rental of space. From 8 a.m. to 11 p.m. Not responsible for articles left in or on car. Agree to the within terms." The court rejected this limitation of liability, although not on the theory that it was a contract of adhesion, but, rather, on the basis that a bailee cannot limit his liability for his own negligence). Surely, when the annualized cost of the collision coverage in the amount of $5,077.80 is put into the equation, the limitation becomes even more "revolting to the moral sense."[5]
The court finds that the damage to the truck is covered by the waiver and the plaintiff is entitled to recover $6,670.00 plus interest at the rate of 14.99% for as long as Visa charged him that rate and thereafter 8% per annum.
The plaintiff also argues that the charges to his Visa card by the defendant constituted a violation of Connecticut Unfair Trade Practice Act (CUTPA), General Statutes § 42-110b. "The purpose of CUTPA is to protect the public from unfair practices in the conduct of any trade or commerce, and whether a practice is unfair depends upon the finding of a violation of an identifiable public policy. CUTPA, by its own terms, applies to a broad spectrum of commercial activity. The operative provision of the act, [General Statutes] § 42-110b (a), states merely that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Trade or commerce, in turn, is broadly defined as the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state. General Statutes § 42-110a (4). The entire act is remedial in character; General Statutes § 42-110b (d); and must be liberally construed in favor of those whom the legislature intended to benefit . . . (Citations and internal quotation marks omitted)." WillowSprings Condominium Assn. v. Seventh BRT Development Corp, 245 Conn. 1, 42
(1998).
"It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the `cigarette rule' by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons] . . . All three CT Page 3073 criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. CUTPA reflects a public policy that favors remedying wrongs that may not be actionable under other bodies of law." (Citations and internal quotation marks omitted)." Id. 42-3.
The manager of the defendant, Paul Kozlowski conceded that the defendant did not have permission from the plaintiff to charge his credit card for the repair to the truck. The defendant relies on the agreement which on the reverse side provided for the following: "10. Credit charges: in the event rentee directs rentor to bill charges hereunder to any other person or organization, such person or organization and rentee shall be jointly and severally liable for all such charges. Rentee expressly authorizes rentor to process a credit card voucher, if any, in his name for charges made hereunder."
Even if the court were to ignore that the agreement was a contract of adhesion, there were other egregious practices by the defendant which would afford the basis for CUTPA violation. Kozlowski conceded he did not know the basis for the February 20, 2001 charges. Second, the charge to the credit card, whether it be those on February 20, 2001, in the total amount of $12,420.00 or the adjusted amount of $6,670.00 has never been justified. The defendant's own estimate indicates the cost of repairs was $5,750.00. Finally, when the plaintiff sought an explanation of the charges from the defendant at its place of business in New Haven where he rented the truck, not only was he not given an explanation, but he was merely handed a business care which read: "Acme Rent-A-Car, 22 Lafayette Place #13, Greenwich, Connecticut 06830, Attn: Legal Dept. No Phone Calls Accepted." This conduct of refusing to explain the charges and answering his inquiry by referring him to its "Legal Department" which is located across the state with "no phone calls accepted" also constitutes a violation of CUTPA.
This is an egregious case which entitles the plaintiff under CUTPA to be reimbursed for the attorneys fees he incurred, all costs and an award of punitive damages.
The court will not enter a monetary judgment until the parties are heard further with respect to an updated amount for attorney fees incurred and further arguments on the amount of punitive damages. The court will also hear evidence in order to calculate the interest if the parties cannot stipulate as to an amount. The hearing will be held on March 14, 2003 at 10:00 a.m. in Courtroom 4D, Superior Court, 235 Church Street, New Haven, Connecticut. CT Page 3074
 Robert J. Berdon Judge Trial Referee